UNITED STATES of America, Plaintiff,

v.

Paul CHARTIER, Defendant.

No. 89 CR 105(S) (ADS).

United States District Court,
E.D. New York.

Oct. 11, 1991.

Andrew J. Maloney, U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Matthew Fishbein, David James, of counsel), for U.S.

John H. Jacobs, New York City, for defendant.

## OPINION AND ORDER

SPATT, District Judge.

Before the Court at this time is the resentencing of the defendant Paul Chartier ("Chartier"), which raises an issue apparently not yet considered by the courts of this Circuit: whether a string of armed robberies concededly committed to support a heroin addiction constitutes a single "common plan or scheme" to avoid "career offender" status, when the prior crimes were committed with the same individuals, within a month, and utilizing the same *modus operandi.*

## BACKGROUND

After a plea of guilty to armed bank robbery, at the first sentencing proceeding on April 6, 1990, the Court determined that the defendant was a "career offender" by reason of at least two prior convictions for crimes of violence. With the "career offender" enhancement, the guideline range was increased to 210 to 262 months.

The Court sentenced the defendant to the maximum 262 months, for the following reasons: (1) the defendant's extensive crim-

inal record; and (2) the Court's observation that a prior state sentence of fifteen years for the several armed robberies had not dissuaded the defendant from committing a subsequent armed robbery.

In *United States v. Chartier*, 933 F.2d 111 (1991), the Second Circuit vacated the sentence and remanded the case for resentencing, essentially on two grounds.

First, it held that a hearing should be held on whether the four armed robberies committed by the defendant in 1974 were part of a "common plan or scheme," as follows:

"... we think Chartier should have a further opportunity to obtain a finding on an issue which turns an increment of 15 years of imprisonment ..." (933 F.2d at p. 116).

Second, the Court stated that "[i]f, upon reconsideration, the District Judge makes a finding that renders Chartier subject to the career offender guideline, we urge the Judge to give renewed consideration to the selection of the particular sentence to be imposed within the guideline range" (933 F.2d at p. 117). Also, in that event, since the guidelines range exceeds 24 months, the District Judge would be required to state " 'the reason for imposing a sentence at a particular point within the range' " (*see id., quoting* 18 U.S.C. § 3553[c][1]).

In accordance with this direction, a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir.1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980) was held on September 13, 1991.

## THE LAW

A career offender is one who (1) "was at least eighteen years old at the time of the instance offense," (2) is being sentenced for "a felony that is either a crime of violence or a controlled substance offense", and (3) "has at least two prior felony convictions of either a crime of violence or a controlled substance offense" (Sentencing Guideline § 4B1.1).

Judge Altimari recently discussed the "career offender" provision, as follows:

"The 'career offender' provisions of the Sentencing Guidelines are designed to increase substantially the sentences of those found to be career criminals. *See United States v. Richardson*, 923 F.2d 13, 15 (2d Cir.1991); U.S.S.G. § 4B1.1 and § 4B1.2. Thus, once a defendant is found to be a 'career offender,' his or her base offense level is increased significantly and the defendant is placed automatically in a criminal history category of VI. *See Richardson*, 923 F.2d at 15; U.S.S.G. 4B1.1. To qualify as a career offender, a defendant must, among other things, have two prior felony convictions that are either a 'crime of violence' or a 'controlled substance offense.' U.S.S.G. § 4B1.1." *United States v. Liranzo*, 944 F.2d 73, 78 (2d Cir.1991).

Chartier argues that his four prior armed robbery felony offenses were "related" since they were part of a "common plan or scheme", and therefore he does not have "at least two prior felony convictions" (*see* Sentencing Guideline § 4A1.2, comment n. 3). In support of this contention, he points to: a similar *modus operandi;* the fact that they are the same types of crimes, namely, three armed bank robberies and one Burger King robbery; the crimes occurred within a short period of time; and that they were all committed to support his heroin addiction.

Offenses are "related", if they "(1) occurred on a single occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing" (Sentencing Guideline § 4A1.2, comment n. 3).

It is significant within the factual purview of this case, that a similar *modus operandi* has been held to be insufficient to demonstrate a "common scheme" (*see, e.g., United States v. Burkes*, 937 F.2d 603 [4th Cir.1991] [per curiam] [unpublished opinion]; *United States v. Davis*, 922 F.2d 1385, 1389 [9th Cir.1991]).

In *United States v. Davis, supra*, it was stated:

"Although Davis's two crimes were of a similar type and shared the same *modus operandi*, they nevertheless constituted

two separate crimes which he apparently perpetrated thirteen months apart. The Eleventh Circuit has held, and we agree, that a common *modus operandi* is not enough to demonstrate a single common scheme or plan. *United States v. Jones*, 899 F.2d 1097, 1101 [11th Cir.], *cert. denied*, —— U.S. ——, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990)."

In *United States v. Burkes*, 937 F.2d 603 (4th Cir.1991), it was held:

"Burkes argues that his prior offenses were part of a common scheme. He claims a similar *modus operandi* and notes that both offenses were for possession or distribution of narcotics, that both offenses occurred in Connecticut, that the offenses occurred within six weeks of each other, that he purchased the drugs involved in both offenses from the same supplier in New York, and that his sentence for the second offense was to run concurrent with the sentence for the first offense although it was one year longer. These factors fail to qualify Burkes' offenses as part of a common scheme.

A similar *modus operandi* is insufficient to demonstrate a common scheme (*United States v. Davis*, 922 F.2d 1385 [9th Cir.1991])."

Also, "[a] relation between offenses is not probable when the offenses occurred on different dates and in different jurisdictions" (*Burkes, supra, citing United States v. Rivers, supra; see also United States v. Jones*, 899 F.2d 1097, 1101 [11th Cir.], *cert. denied*, —— U.S. ——, 111 S.Ct. 275, 112 L.Ed.2d 230 [1990]).

Finally, concurrent sentences rendered in the prior offenses do not necessarily indicate a relation or common plan (*see, e.g., United States v. Flores*, 875 F.2d 1110, 1114 [5th Cir.1989]).

In *Jones, supra*, the defendant committed two bank robberies involving two different banks on the very same day, approximately ninety minutes apart. The Eleventh Circuit affirmed the District Court which found that "the two incidents in question were temporally distinct and involved two different banks and two differ-

ent tellers as victims ... and were not part of a single common scheme or plan" (899 F.2d at p. 1101).

A case factually similar to the one at bar is *United States v. Rivers*, 929 F.2d 136 (4th Cir.1991). The defendant in *Rivers* had two prior convictions for armed robberies of gas stations committed twelve days apart. The District Court found that these two prior offenses were "related" since they were committed pursuant to a common plan. The Fourth Circuit reversed this finding as "clearly erroneous", and held the defendant to be a "career offender" as a matter of law. In rejecting the District Court's reasoning, the Circuit Court stated:

"This finding is clearly erroneous. Such reasoning would have the effect of making related offenses of almost all crimes committed by one individual. *The fact that both offenses were committed to support one drug habit does not make the offenses related under § 4A1.2.*

The district court's finding '[i]t was only an accident of geography that precluded such consolidation' is not supported by the record and is clearly erroneous. The offenses were committed in different jurisdictions and on different dates. The offenses were adjudicated separately and appellant was sentenced separately" (929 F.2d at p. 140) (emphasis supplied).

## THE HEARING

With the settled law of the other Circuits in mind, the Court will now review the facts established at the *Fatico* hearing held on September 13, 1991.

The defendant Paul Chartier was the sole witness. In essence, the defendant testified that in 1974 he was involved in a series of criminal activities. He was "strung out on heroin" and committed the crimes to obtain drugs. He got together with two other addicts and they "decided to rob together."

The first robbery occurred at a Burger King in Nassau County in late October or early November 1974. While one perpetrator waited in a stolen get-away car, and

another stood guard in the store, the defendant, wielding a gun, vaulted the counter and took $600. The defendant was wearing a ski mask.

After the Burger King robbery, "we ran out of money real fast." John Taylor, one of the other two individuals, was on parole for bank robbery, "so we decided to rob banks." On November 9, 1974, the defendant took part in an armed robbery of the Suburbia Federal Savings Bank in East Rockaway, Nassau County, New York. This time only the defendant and John Taylor participated in the robbery. The defendant had been in the bank before and knew that there were no glass partitions and no bank guard. Again, Taylor stood guard with the same gun while the defendant vaulted the counter and emptied the tellers' drawers of $9,682.66 and the two ran out to a different stolen get-away car, again wearing ski masks.

Sixteen days later, on November 25, 1974, the defendant held up the "Federally University Insured Bank & Trust Company" (sic) in Newtown, Massachusetts. Although they did not initially intend to rob this bank, when the defendant traveled to Massachusetts to change the small bills obtained from the Suburbia Bank holdup into large bills, he decided, spur of the moment, to rob the Massachusetts bank. The defendant and the two coperpetrators later committed the crime in the same general manner as the two prior robberies. "I would vault the counter, and this one, I think, John had the back door, Joey had the front door ... (and) we had a stolen car a block away ... (and) ... the good car was two or three blocks away." During this robbery, police officers intercepted their car "and started shooting at us." They also wore ski masks in this robbery.

In each robbery they used different stolen cars as "get-away" cars parked outside the banks (or Burger King) and drove to a different "legitimate" car, which was rented, as their "good" car, parked a few blocks away.

Four days after the Massachusetts robbery, on November 29, 1974, the defendant committed his fourth armed robbery; this time in Nassau County. The defendant lived in Valley Stream and had previously been in the Valley Bank of New York. John Taylor said to him, "We got to do another bank". Joey was "shaken up by the police officers firing at us in Boston, so he wasn't with us on that one." Again, wearing a ski mask, the defendant vaulted the counter, announced "robbery", and cleaned out two tellers' drawers while Taylor "played guard", and they proceeded to their stolen car and then to the "good" car.

After these armed robberies, the defendant was arrested, prosecuted, sentenced and jailed.

The defendant testified that the stolen money from each robbery was used for drugs; "we were all strung out on drugs".

On cross-examination, the defendant revealed that he was a heroin addict since he was fourteen years of age. The defendant again stated that he committed the four 1974 robberies to buy heroin. The defendant further testified that the same reason motivated his actions in committing the 1988 Staten Island bank robbery. In 1988 he was also "desperate for heroin" and also robbed a bank close to his home. Then a series of questions revealed the true motivation behind the armed robberies committed by the defendant as follows:

"Q And when you were using drugs, you had a daily need for heroin, correct?

A Basically, yes.

Q And that would also be true in 1988?

A Not daily.

Q But frequently, in any event, whether it's everyday?

A Yes, sir.

Q Now, you knew in 1988, didn't you, when you robbed the bank, that the money that you stole was eventually going to run out, right?

A Well, yes.

Q So you knew you were going to have to do something else to get money once the money you stole ran out, correct?

A *Well, I don't think your thinking process don't go that far. It's immediate need.*

\* \* \* \* \* \*

Q It would be fair to say that you would decide when the money ran out what you were going to do next?

A *I was living like for the minute.*

THE COURT: Living what?

THE WITNESS: Living for the minute, not even the day. Like when you are strung out.

Q In fact, sir, I think you told us on your direct testimony, and I wrote this as near as I could, if I am not reciting this correctly, tell me, that in 1974, after your first robbery at the Burger King, you said you ran out of money real fast, then you and Mr. Taylor and Mr. Massaro decided to rob other places, is that so?

A Yes.

Q So you had not decided when you robbed the Burger King you were going to rob in the future?

A *We knew we were going to rob. We didn't know the date or place.*

Q Despite the fact you were strung out in 1974?

A Yes, sir.

Q *And you just told us before, when you are using heroin and living for the minute, correct?*

A *Yes, sir.*

Q You are telling us, sir, that in 1974, you had this all planned out before you did the first robbery?

A Yes, sir.

\* \* \* \* \* \*

THE WITNESS: *Yes. Like I said, we didn't say well, on November 9, November 25, we are going to go here and rob this and then rob that, but we hooked up as a team to rob in the same fashion, you know, whenever we needed the money that's what we were going to do.*

Q *Had you planned to do another one?*

A *Not a certain place or time, no, because we had money.*

Q In other words, when the money ran out then you might decide to rob another place?

A We definitely were going to rob another place.

Q But you told us in 1988—

THE COURT: *You mean the Valley Stream Bank money, when that ran out then you would decide to rob another bank?*

THE WITNESS: *We knew we were going to rob a bank when the money ran out. But when it got down too real low, that's when we looked, you know.* (Tr. at pp. 22–26) (emphasis supplied).

Q And you also told us on your direct testimony, sir, that you decided to go up to Massachusetts to rob the bank up there, after things got hot for you in New York, because you had committed two robberies in New York, is that fair to say?

A Yes.

Q *So you didn't decide to go to Massachusetts until after you had robbed the second bank, the bank in New York, correct?*

A *Correct.*

Q You also told us again, on your direct testimony, that after you came back from Massachusetts to Valley Stream, you said when we came back John said "We have to do another bank"?

A Yes, sir.

Q *It's fair to say then you had not decided to do another bank until you came back to New York?*

A *Well, let me try to explain. We were partners in this. We had a common way of doing this and that's how we were going to do it. Like I said before, the dates were not planned out. The places were not planned out.* The M O and the way we did it and everything that was one thing. Like I said, if I didn't get caught at that time I am sure there would have been another one, you know."

(Tr. at p. 25) (emphasis supplied).

The defendant was sentenced for the prior 1974 armed robberies to seven and one-half to fifteen years, and he actually served nine years and six months. In response to a question by the Court as to any other felonies he committed before or after 1974, the defendant stated he committed many burglaries since he was fourteen. After he left prison in 1984, he was charged with

stealing a car and was arrested for possession of heroin and cocaine, which is apparently still a pending state misdemeanor charge.

In his closing arguments, the defendant's counsel contended that (1) the guidelines do not define a "single common plan or scheme"; (2) the Second Circuit stated that "the circumstances have supported a finding of common scheme or plan, had one been made"; (3) the defendant's testimony is uncontradicted; and (4) the *modus operandi* from the four armed robberies was the same.

## CONCLUSIONS

█ Considering all of the circumstances of the four prior armed robbery felony convictions, this Court finds that the four prior felony convictions were not "related" within the meaning of the Sentencing Guidelines.

First, all four robberies, three in New York, one in Massachusetts, were charged in separate indictments, and there was no charge of conspiracy linking any of these substantive offenses. Further, the state authorities never joined the offenses for purposes of investigation or prosecution.

Second, accepting all of the defendant's testimony as true, Chartier has not offered any proof that the four felonies were "related" or part of a "single common scheme or plan". What has been established is that the four armed robberies involved the same defendant, who committed the same types of crimes, employed the same *modus operandi*, and claims they were all done to support his heroin addiction. The precedent from the Circuits is clear that the mere similarity of separate crimes committed within a short period of time does not create a "common plan or scheme" so as to avoid career offender status. This is the precise factual situation rejected by the *Rivers* and *Kinney* courts. In fact, the Fourth Circuit in *Rivers* found that the District Court's finding of "career offender" based upon such similar crimes committed within twelve days to be clearly erroneous and determined the issue on appeal as a matter of law. Chartier has offered no evidence other than his allegation that the crimes were all committed to support his drug habit and that they were committed in a similar manner, to support his contention that the four crimes, committed in two states, were related or committed pursuant to a common scheme or plan.

In a letter dated September 20, 1991, from Ian Lowell Heller, Esq., counsel to the defendant's attorney, he states at page three:

> "Indeed, if the facts testified to by Mr. Chartier do not provide the basis to a finding of common scheme or plan, it is unlikely that any facts or circumstances could be defined as such. If this is not a common scheme or plan, nothing is!"

We know from a review of the pertinent precedents that crimes committed in a similar *manner*, does not necessarily mean that they are part of a "single common *plan* or scheme". Theoretically, perhaps if the defendant and his co-perpetrators sat around a table on October 30, 1974 and planned two consecutive robberies of two predetermined locations, on two predetermined dates, that may be sufficient to establish a single common plan or scheme.

Here, the defendant conceded that the crimes were committed, albeit in a similar manner, when his money ran out and he decided he needed additional funds to support his drug habit. These decisions to rob were four separate "spur of the moment" decisions on each of four separate occasions and were not related or part of a single common scheme or plan.

Accordingly, based upon the foregoing, the Court finds that the four 1974 armed robberies were not "related" and were not part of a "single common plan or scheme". The Court therefore finds that the defendant Paul Chartier is a "career offender" pursuant to Sentencing Guideline 4B1.1, and, in the sentencing now before the Court should be in criminal history category VI.

The defendant will now be sentenced by this Court.

SO ORDERED.