UNITED STATES of America, Appellee,

v.

Paul C. CHARTIER, Defendant–Appellant.

No. 987, Docket 91–1619.

United States Court of Appeals, Second Circuit.

Argued Feb. 19, 1992.

Decided June 23, 1992.

David C. James, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Susan Corkery, Asst. U.S. Atty., on the brief), for appellee.

Ian Lowell Heller, New York City (John H. Jacobs, on the brief), for defendant-appellant.

Before: VAN GRAAFEILAND, KEARSE, and McLAUGHLIN, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Paul C. Chartier appeals from a final judgment of the United States District Court for the Eastern District of New York, Arthur D. Spatt, *Judge*, convicting him, upon his plea of guilty, on one count of bank robbery, in violation of 18 U.S.C. § 2113(d) (1988). Following a remand from this Court in *United States v. Chartier*, 933 F.2d 111 (2d Cir.1991) ("*Chartier I*"), the district court sentenced Chartier to, *inter alia*, a 236–month term of imprisonment, having found that Chartier was a "career offender" within the meaning of the federal Sentencing Guidelines ("Guidelines") 775 F.Supp. 582. On appeal, Chartier contends that the district court's finding was impermissible in light of *Chartier I*. We disagree and affirm the judgment.

## I. BACKGROUND

The events leading to this prosecution are set forth in detail in *Chartier I*, familiarity with which is assumed. In December 1988, Chartier robbed a bank in Staten Island, New York. He was arrested and pleaded guilty to one count of violating § 2113(d), an offense carrying a statutory maximum prison term of 25 years (*i.e.*, 300 months). Under the Guidelines, the offense level for this robbery, after adjustments for use of a weapon, amount of

money taken, and acceptance of responsibility, was 20. Chartier's prior record, which included convictions for four armed robberies in 1974, gave him a criminal history category of VI. For a defendant in that category with an offense level of 20, the Guidelines prescribed a sentencing range of 70–87 months' imprisonment.

However, as discussed in Part I.A. below, the Guidelines prescribe increased punishment for a "career offender," defined in pertinent part as a person who has at least two prior convictions for crimes of violence. *See* Guidelines §§ 4B1.1, 4B1.2(1)(i). For Chartier's 1988 offense, career offender treatment would set a range of 210–262 months' imprisonment. Chartier urged the court not to treat him as a career offender, arguing, *inter alia*, that his four prior convictions should be treated as but one conviction because (a) three of his robberies, which had occurred in New York and had been prosecuted by state authorities, were consolidated for sentencing, and (b) the fourth robbery, which had occurred in Massachusetts and had been prosecuted by the federal government, had resulted in a sentence that was imposed to run concurrently with his New York sentence. The court rejected Chartier's arguments and sentenced him to 262 months' imprisonment.

A. *The Career Offender Provisions and* Chartier I

Chartier appealed, and this Court vacated the sentence principally on the ground that there were factual questions to be resolved with respect to the applicability of the career offender guideline. That guideline, which, as discussed in greater detail in Part II.B. below, was adopted in response to a statutory mandate that certain persons who have repeatedly been convicted of, *inter alia*, crimes of violence be sentenced "to a term of imprisonment at or near the maximum term authorized," 28 U.S.C. § 994(h) (1988), provides that

[a] defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of

violence or a controlled substance offense, and (3) *the defendant has at least two prior felony convictions of* either *a crime of violence* or a controlled substance offense.

Guidelines § 4B1.1 (emphasis added). For these purposes, "two prior felony convictions" is defined as follows:

The term "two prior felony convictions" means (A) the defendant committed the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense (*i.e.*, two felony convictions of a crime of violence, two felony convictions of a controlled substance offense, or one felony conviction of a crime of violence and one felony conviction of a controlled substance offense), *and (B) the sentences for at least two of the aforementioned felony convictions are counted separately under the provisions of Part A of this Chapter.*

Guidelines § 4B1.2(3) (emphasis added). Application Note 4 to § 4B1.2 instructs the court to consult § 4A1.2 of the Guidelines with respect to part (B) of this definition, *i.e.*, in order to determine whether a defendant's "felony convictions are counted separately." Section 4A1.2(a)(2) provides that

[p]rior sentences imposed in unrelated cases are to be counted separately. Prior sentences imposed in related cases are to be treated as one sentence for purposes of the criminal history....

In turn, the commentary to this section describes the meaning of the term "related cases":

*Related Cases.* Cases are considered related if they (1) occurred on a single occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing.

Guidelines § 4A1.2(a)(2) Application Note 3.

In *Chartier I*, with respect to the separateness of Chartier's convictions, we noted that under Guidelines § 4A1.2(a)(2) and part (3) of its Application Note 3, his convictions for the New York robberies were required to be treated as a single conviction because they had been consolidated for sen-

tencing. Thus, the crucial question became whether Chartier's conviction for the Massachusetts robbery was to be counted separately from the New York convictions. Rejecting the contention that that robbery was to be treated as related simply because the sentence was imposed concurrently with his New York sentence, we noted (a) that the Massachusetts robbery had occurred in the interval between two of the New York robberies, (b) that all four robberies had been committed within a span of a few weeks, and (c) that all of the robberies had been for the purpose of supporting Chartier's addiction to narcotics. We concluded that there was a question as to whether all four robberies were in fact committed pursuant to a single scheme or plan. Since this issue had not been raised in the district court and the record was undeveloped, we remanded for a finding on that question:

> All four offenses were committed within a short period of time, in similar fashion, and for the same purpose of supporting Chartier's addiction. The circumstances would have supported a finding of common scheme or plan, had one been made. Unfortunately, there is no finding one way or the other on the point, an omission doubtless attributable to the failure of Chartier's trial counsel to advance this precise contention in the trial court.... [W]e think Chartier should have a further opportunity to obtain a finding on an issue on which turns an increment of 15 years of imprisonment.... Accordingly, we will vacate the sentence and remand for a finding as to whether the four prior offenses were "part of a single common scheme or plan" for purposes of applying the career offender guideline.

*Chartier I*, 933 F.2d at 116.

We further instructed the court that if it found that the four offenses were not part of a single common scheme or plan, a finding that would result in career offender status, the court should consider and give reasons for its selection of the precise prison term to be imposed on Chartier within the career offender range:

> If, upon reconsideration, the District Judge makes a finding that renders Chartier subject to the career offender guideline, we urge the Judge to give renewed consideration to the selection of the particular sentence to be imposed within the guideline range.

*Id.* at 117.

**B.** *The Proceedings and Decision on Remand*

On remand, the court held an evidentiary hearing at which Chartier testified and described the robberies of which he had been convicted. He testified that he had been a heroin addict since the age of 14 and that in 1974, at the age of 25, he had joined forces with two other addicts, John Taylor, who had then recently been released from prison, and Joey Massaro. Together, they decided to commit robberies to obtain money to buy narcotics. They first robbed a Burger King in Nassau County, New York. Acquiring only $1,600 in that robbery, they then decided to concentrate on banks because the proceeds would be greater.

They decided to rob only banks that had no guards and that had no glass partitions atop the counters at which the tellers worked. The second and fourth robberies were such banks in Nassau County; the third robbery was a similar bank in Massachusetts. Apparently, in all four robberies Chartier and Taylor followed a general pattern of (a) stealing a car that they parked outside the targeted premises, (b) parking a rented car a few blocks away, (c) entering the premises wearing ski masks, (d) having Chartier announce the robbery, (e) having Taylor stand guard while Chartier vaulted the counter and collected money, (f) leaving the premises no more than two minutes after entering, (g) making their initial getaway in the stolen car, and (h) switching to the rented car. In the Burger King robbery, Massaro waited outside in the stolen getaway car; in the Massachusetts robbery, Massaro guarded a door of the bank. In the two New York bank robberies, only Chartier and Taylor participated.

Chartier described the background of the Massachusetts robbery as follows:

Well, John had some guys he met in a federal peniteniary [*sic*] up in Boston and we were getting hot in New York because we already did two robberies in Nassau County. So we decided to go up there, and from this prior bank robbery, what was the name of it, Rockaway Suburbia Federal Savings we had gotten, when I grabbed the money out of the draw [*sic*] I grabbed fives and tens and stuff like that, so I had a thing of small bills, so when we were going up to Boston, Newton like the suburbs right outside Boston, so I went into a bank, not to rob, but just to go in there to change the money into large bills. And when I went into the bank it fit perfect, no glass, near a thoroughfare, no guards, a few people in it, and I went back and I told him. I said, "I found one that looks good." And then I went back and I told him, I don't know how long after, but we robbed it pretty quick.

(Hearing Transcript ("Tr.") 15–16.)

With respect to the 1988 robbery leading to the present prosecution, Chartier testified on cross-examination by the government as follows:

Q. Now, you knew in 1988, didn't you, when you robbed the bank, that the money that you stole was eventually going to run out, right?

A. Well, yes.

Q. So you knew you were going to have to do something else to get money once the money you stole ran out, correct?

A. Well, I don't think your thinking process don't [*sic*] go that far. It's immediate need.

Q. You were planning to rob another bank in 1988 to get more money?

A. No.

Q. It would be fair to say that you would decide when the money ran out what you were going to do next?

A. I was living like for the minute.

THE COURT: Living what?

THE WITNESS: Living for the minute, not even the day. Like when you are strung out.

(Tr. 22–23.)

With respect to the 1974 robberies, Chartier's cross-examination testimony was as follows:

Q. In fact, sir, I think you told us on your direct testimony, and I wrote this as near as I could, if I am not reciting this correctly tell me, that in 1974, after your first robbery at the Burger King, you said you ran out of money real fast, then you and Mr. Taylor and Mr. Massaro decided to rob other places, is that so?

A. Yes.

Q. So you had not decided when you robbed the Burger King you were going to rob in the future?

A. We knew we were going to rob. We didn't know the date or place.

Q. Despite the fact you were strung out in 1974?

A. Yes, sir.

Q. And you told us just before, when you are using heroin and living for the minute, correct?

A. Yes, sir.

Q. You are telling us, sir, that in 1974, you had this all planned out before you did the first robbery?

A. Yes, sir.

. . . .

THE WITNESS: . . . . Like I said, we didn't say well, on November 9, November 25, we are going to go here and rob this and then rob that, but we hooked up as a team to rob in the same fashion, you know, whenever we needed the money that's what we were going to do.

Q. You told us on your direct testimony you ran out of money real fast and then you decided to rob banks after you committed the Burger King robbery?

A. It was decided to go back. We only got a certain amount of money to just change the robbery from a Burger King to a bank.

Q. And you also told us on your direct testimony, sir, that you decided to go up to Massachusetts to rob the bank up there, after things got hot for you in

New York, because you had committed two robberies in New York, is that fair to say?

A. Yes.

Q. So you didn't decide to go to Massachusetts until after you had robbed the second bank, the bank in New York, correct?

A. Correct.

Q. You also told us again, on your direct testimony, that after you came back from Massachusetts to Valley Stream, you said when we came back John said "We have to do another bank"?

A. Yes, sir.

Q. It's fair to say then you had not decided to do another bank until you came back to New York?

A. Well, let me try to explain. We were partners in this. We had a common way of doing this and that's how we were going to do it. Like I said before, the dates were not planned out. The places were not planned out. The M O and the way we did it and everything that was one thing. Like I said, if I didn't get caught at that time I am sure there would have been another one, you know.

Q. Had you planned to do another one?

A. Not a certain place or time, no, because we had money.

Q. In other words, when the money ran out then you might decide to rob another place?

A. We definitely were *going to rob* another place.

. . . .

THE WITNESS: We knew we were going to rob a bank when the money ran out. But when it got down too [*sic*] real low, that's when we looked, you know.

(Tr. 23–26.)

In an Opinion and Order dated October 11, 1991 ("Decision on Remand"), the district court concluded that Chartier's convictions were not "related" within the meaning of the Guidelines and that Chartier should therefore be considered a career offender. The court discussed *United*

*States v. Liranzo*, 944 F.2d 73, 79 (2d Cir. 1991), in which this Court had stated that the prior convictions requirement of the career offender guideline should be construed strictly in favor of the defendant; it discussed *Chartier I*'s directions for the findings to be made on remand; and it discussed decisions from other circuits in which groups of robberies had been found not to be part of a single plan or scheme, including *United States v. Rivers*, 929 F.2d 136 (4th Cir.) (robberies of two gasoline stations in different states 12 days apart held not part of a single common scheme or plan), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991); *United States v. Jones*, 899 F.2d 1097, 1101 (11th Cir.) (upholding ruling that robberies of two banks approximately 90 minutes apart were not part of a single common scheme or plan), *cert. denied,* —— U.S. ——, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990); and *United States v. Kinney*, 915 F.2d 1471, 1472 (10th Cir.1990) (same re robberies of three banks, two in one state, one in another, over a three-month period to support defendant's drug addiction).

Here, the district court stated that,

 . . . accepting all of the defendant's testimony as true, Chartier has not offered any proof that the four felonies were "related" or part of a "single common scheme or plan". What has been established is that the four armed robberies involved the same defendant, who committed the same types of crimes, employed the same *modus operandi*, and claims they were all done to support his heroin addiction. The precedent from the Circuits is clear that the mere similarity of separate crimes committed within a short period of time does not create a "common plan or scheme" so as to avoid career offender status. This is the precise factual situation rejected by the *Rivers* and *Kinney* courts. In fact, the Fourth Circuit in *Rivers* found that the District Court's finding of "career offender" based upon such similar crimes committed within twelve days to be clearly erroneous and determined the issue on appeal as a matter of law. Chartier has

offered no evidence other than his allegation that the crimes were all committed to support his drug habit and that they were committed in a similar manner, to support his contention that the four crimes, committed in two states, were related or committed pursuant to a common scheme or plan.

Decision on Remand at 14–15. The court found that Chartier's Massachusetts robbery had been a spur-of-the-moment decision, *id.* at 9, and it emphasized Chartier's testimony that, as heroin addicts, Chartier and his cohorts had lived for the moment and merely knew that when they needed money, they would rob another bank in the same way. The court concluded that the presence of

> crimes committed in a similar *manner*, does not necessarily mean that they are part of a "single common *plan* or scheme". Theoretically, perhaps if the defendant and his co-perpetrators sat around a table on October 30, 1974 and planned two consecutive robberies of two predetermined locations, on two predetermined dates, that may be sufficient to establish a single common plan or scheme.
>
> Here, the defendant conceded that the crimes were committed, albeit in a similar manner, when his money ran out and he decided he needed additional funds to support his drug habit. These decisions to rob were four separate "spur of the moment" decisions on each of four separate occasions and were not related or part of a single common scheme or plan.

*Id.* at 16 (emphasis in original).

Accordingly, the court sentenced Chartier as a career offender and imposed a term of 236 months' imprisonment. It explained its selection within the prescribed 210–262-month range as recognition of, *inter alia,* Chartier's candor at the resentencing hearing, and comments of this Court in *Chartier I.*

This appeal followed.

## II. DISCUSSION

On appeal, Chartier contends that the district court on remand refused to follow *Chartier I* and that a finding that Chartier had engaged in a common scheme or plan was required. We disagree.

### A. *The Scope of* Chartier I

Chartier contends, first, that the message of *Chartier I* was that on remand, if the district court found as a matter of fact that Chartier had committed four robberies within a three-to-four week period, had used the same *modus operandi,* and had committed all of the robberies with the same motive, *i.e.,* to obtain money for the support of his heroin addiction, the district court was mandated to find that the Massachusetts and New York robberies were part of a single common scheme or plan. His contention is unsupportable.

The *Chartier I* statement on which Chartier principally relies was that the circumstances suggested by the record "would have *supported* a finding of common scheme or plan, had one been made." 933 F.2d at 116 (emphasis added). However, stating that the circumstances would have "supported" a certain finding does not mean that such a finding was compelled. Indeed, we referred to the absence of a finding as to common scheme or plan "one way or the other." *Id.* Further, we proceeded to give the district court instruction as to what should occur on remand "[i]f, upon reconsideration, the District Judge makes a finding that renders Chartier subject to the career offender guideline." *Id.* at 117. Since a ruling that Chartier was subject to the career offender guideline was permissible in the present case only if the robberies were not part of a single common scheme or plan, *Chartier I* plainly did not rule that the district court was required to find that the Massachusetts and New York robberies were part of such a scheme or plan.

### B. *The Finding of No Single Common Scheme or Plan*

The question for the present appeal is whether the district court could properly, on the record compiled on remand, rule that Chartier's Massachusetts robbery and

his New York robberies were not all part of a single common scheme or plan. Our standard of review is mixed. To the extent that there is a question as to whether the district court properly construed the term "common scheme or plan," our review is *de novo*. On the other hand, a finding as to whether or not conduct occurred as part of a common scheme or plan is "essentially factual," *United States v. Vazzano*, 906 F.2d 879, 883 (2d Cir.1990), and the district court's finding will not be overturned by this court unless it is clearly erroneous, *see id.; United States v. Connor*, 947 F.2d 1018, 1020 (2d Cir.1991). We conclude that the district court did not misinterpret the term and that its finding was not clearly erroneous.

As indicated in *Chartier I*, the career offender guideline is a response to a statutory instruction to the Sentencing Commission, enacted as part of the Sentencing Reform Act of 1984, that the Guidelines are to specify for any person who is 18 years of age or older and who (a) is convicted of a crime of violence or certain narcotics offenses, and (b) has previously been convicted of two or more felony offenses that are crimes of violence or narcotics trafficking, a sentence "to a term of imprisonment at or near the maximum term authorized," 28 U.S.C. § 994(h). *See Chartier I*, 933 F.2d at 112–13. The legislative history of § 994(h) reveals that the concern underlying this instruction was the belief that the vast majority of violent crimes and narcotics trafficking offenses are committed by a small minority of offenders:

> It is well documented that a relatively small number of repeat offenders are responsible for the bulk of the violent crime on our streets. In Washington, D.C., it is estimated that 25 persons are responsible for committing 400 crimes a month. A recent Rand Corp. [ ] study in California reveals that the average drug dealer has committed at least five assaults and robberies against strangers in order to ply his trade. It is likely that 50 percent of all violent crimes are committed by only 5 percent of all criminals. Shrinking law enforcement resources must be targeted on incapacitating the tiny minority of criminals responsible for the overwhelming majority of violent crimes. Career criminals must be put on notice that their chronic violence will be punished by maximum prison sentences. . . .

128 Cong.Rec. 26,518 (Sept. 30, 1982) (remarks of bill sponsor Senator Kennedy). Thus, the principal goal was twofold: (1) to "incapacitat[e]" the career offender, and (2) to "put on notice" other would-be repeat offenders that "chronic violence will be punished by maximum prison sentences." Though these remarks were made in support of a section in one of the bills leading to the Sentencing Reform Act that directly provided that " '[a] career criminal shall receive the maximum or approximately the maximum penalty for the current offense,' " *see id.* at 26,512, and Congress determined that it was preferable not to include that provision in the statute but to instruct the Sentencing Commission, whose creation was part of the legislation, to adopt suitable guidelines toward that end, *see* S.Rep. No. 98–225, 98th Cong., 1st Sess. 175 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3358, the congressional premise remained that "substantial prison terms should be imposed on repeat violent offenders and repeat drug traffickers," *id.*

The Commission adopted the career offender guideline provisions discussed in Part I.A. above in response to the congressional mandate in § 994(h). It set a range of imprisonment near the maximum for repeat violent offenders and repeat drug traffickers, and attempted to clarify that what was meant by "two prior felony convictions" was not, *inter alia*, two convictions for acts that were related by reason of being part of a single common scheme or plan. The Guidelines do not offer explicit clarification of the meaning of the term "single common scheme or plan." In other parts of the Guidelines, however, such as those dealing with relevant conduct for calculation of a defendant's offense level, the term has been used in conjunction with the phrase "same course of conduct," and we have been careful to note that "same

course of conduct" and "common scheme or plan" are not synonymous. *See, e.g., United States v. Perdomo*, 927 F.2d 111, 114–15 (2d Cir.1991) (construing Guidelines § 1B1.3(a)(2)); *United States v. Santiago*, 906 F.2d 867, 871–73 (2d Cir.1990) (same).

■ In the career offender context as well, we think it clear that the term "single common scheme or plan" must have been intended to mean something more than simply a repeated pattern of criminal conduct. A defendant may follow the same course of conduct by, *e.g.*, engaging in criminal acts, performing certain roles in the crimes, and repeating those acts and reprising those roles. His pattern, however, even if repeated within a short period of time, *see, e.g., United States v. Butler*, 970 F.2d 1017, 1027 (2d Cir.1992) (two robberies 15 minutes apart), does not necessarily mean that he has acted pursuant to a single common scheme or plan. The concept of "scheme" or "plan" involves subjective as well as objective elements, though the subjective elements may of course be inferable from events that are objectively observable. Whether or not such an inference is to be drawn is a question for the finder of fact. The mere fact, however, that, in engaging in a pattern of criminal behavior, the defendant has as his purpose the acquisition of money to lead a particular lifestyle does not mean either that he had devised a single common scheme or plan or, if he had, that his course of conduct was necessarily part of it. We do not believe the Commission intended § 4A1.2 Application Note 3 to imply that crimes committed simply in order to fund a lifestyle constitute parts of a single common scheme or plan; and if the Commission had so intended, we would not be able to conclude that it had carried out its congressional mandate. In sum, we conclude that evidence of a plan simply to commit robberies when and as money is desired or needed cannot be enough by itself to permit the repeat robber to avoid being considered a career offender.

■ While the four robberies committed by Chartier in 1974 fit a pattern, the evidence easily supported the finding that they were not part of a single common scheme or plan. For example, the victim of the first robbery was a fast-food restaurant, not a bank. Chartier and his two cohorts decided to rob banks only after they discovered that the proceeds from the restaurant robbery were small. Thus, if there was a scheme or plan in connection with the first robbery, it was inferable that the plan soon changed.

Further, though all three of the participants had addictions, the identity of the participants in the four robberies was not constant: in two of the four robberies, only Chartier and Taylor participated; in the other two they were assisted by Massaro. Nor was the variation in cast determined by an overall plan: Massaro did not participate in the fourth robbery simply because he had become frightened in the third.

Finally, the district court's finding that the Massachusetts robbery was a spur-of-the-moment enterprise was likewise amply supported by the evidence. Chartier testified, for example, that he, Taylor, and Massaro had not gone to Massachusetts planning to commit a robbery. He also testified that he and his cohorts, "living for the minute," had no long-range plan except to commit robberies when and as they ran out of money. But the Massachusetts robbery did not fit even this supposedly unifying plan, for Chartier had gone into that bank merely to change some bills, "not to rob," and when they robbed that bank they had not run out of money.

In light of the record developed on remand, we conclude that the circumstances of Chartier's four 1974 robberies did not lend themselves to a finding that they were part of a single common scheme or plan, and that the district court's finding that they were not is not clearly erroneous. Accordingly, the court did not err in sentencing Chartier as a career offender.

## CONCLUSION

We have considered all of Chartier's arguments on this appeal and have found

them to be without merit. The judgment of conviction is affirmed.