**UNITED STATES of America**

v.

**Clarence HEATLEY, et al., Defendants.**

**No. S11 96 Cr. 515(SS).**

United States District Court,
S.D. New York.

Nov. 12, 1998.

---

Alan S. Futerfas, New York City, Joel S. Cohen, New York City, David A. Ruhnke, Montclair, NJ, for defendant Clarence Heatley.

Mary Jo White, United States Attorney, New York City, Sharon L. McCarthy, Andrew S. Dember, Assistant United States Attorneys, for U.S.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Defendant Clarence Heatley challenges the superseding indictment in this case on several grounds, all of which stem from a series of proffer sessions in which Heatley made various inculpatory statements. Heatley moves for either dismissal of the indictment or an order directing the United States to grant Heatley a cooperation agreement. For the reasons to be discussed, the Court denies Heatley's motion.

## BACKGROUND

The following constitute the Court's findings of fact, as shown by a preponderance of the evidence. Defendant Clarence Heatley was indicted on July 15, 1996, on three counts of murder and conspiracy to murder in aid of racketeering activity. On August 12, 1996, Heatley was arrested by detectives of the New York City Police Department and transferred to federal custody. (Heatley moved for suppression of statements made that day, a motion which was denied by this Court in a separate Opinion and Order. *See United States v. Heatley,* 32 F.Supp.2d 131 (S.D.N.Y.1998). Familiarity with that Opinion is assumed; however, pertinent facts relating to his arrest and post-arrest statements are included here.)

After being transferred to the Federal Bureau of Investigation offices at 26 Federal Plaza that evening, Heatley received proper *Miranda* warnings and validly agreed to waive his rights and speak to the agents, chiefly FBI Special Agent David Higgins and NYPD Detective Vincent Flynn. Heatley asked the agents about how (and whether) he could help himself through cooperation, and Higgins explained in some detail the process of cooperation, including information regarding the Federal Sentencing Guidelines and what a § 5K.1 letter is. The agents never promised Heatley a cooperation agreement

if he agreed to talk. However, according to Detective Flynn, he and Higgins did tell Heatley that "the only thing that would be asked of him was to tell the truth when he did cooperate" and "all he would ever asked to do is to be truthful." Tr. (11/13/97) at 109, 127. Heatley made various inculpatory statements about himself and others during the next two or three hours, and continued to express interest in cooperating. The agents informed Heatley that they would take the statements made at 26 Federal Plaza and bring them to the attention of the United States Attorney.

The next day, August 13, Detective Flynn contacted AUSA Sharon McCarthy and informed her both of Heatley's statement and of his desire to explore cooperation. McCarthy told her supervisor, Elizabeth Glazer, of this development. Later that day, after Heatley's presentment before Magistrate Judge Peck, McCarthy met with Andrew Schapiro, the Legal Aid Society defense counsel assigned to defend Heatley. McCarthy told Schapiro that Heatley had been under investigation for quite some time and that the U.S. Attorney's office considered him the leader of a criminal enterprise and personally responsible for significant criminal activity. The original indictment, she explained, was only "the tip of the iceberg" as far as the government was concerned. The purpose of this discussion, according to McCarthy, was to make Schapiro "understand the severity of the crimes that we believed, based upon our investigation, Mr. Heatley had been involved in for sometime in order for him to understand the full risks associated with a proffer." Tr., at 18.[1] McCarthy asked Schapiro to follow up on Heatley's expressed desire to cooperate; Schapiro said he would talk to McCarthy after he had a chance to speak to Heatley about it.[2]

Schapiro consulted with Heatley and confirmed that he was interested in cooperating. On or about August 16, Schapiro told McCarthy over the phone that they were interested in discussing cooperation; they tentatively set the first proffer session for August 21. Also about that time, Schapiro sent a copy of the indictment to Robert Gottlieb, an attorney who had represented Heatley in the past; Schapiro assumed that Heatley was considering retaining Gottlieb for his defense. After reviewing the indictment, Gottlieb met with Heatley at the Metropolitan Correctional Center (MCC), and Heatley decided to stay with Schapiro's representation.

On August 19, Heatley called Schapiro to relay certain information about individuals who might be in danger which he thought would be helpful to the government as a show of good faith. During this conversation, Heatley also told Schapiro that Gottlieb had expressed serious concern about taking Heatley into a proffer session with the government. According to Schapiro, Heatley told him that "Gottlieb had told [Heatley] that Sharon McCarthy is not a straight shooter and that ... I, Andrew Schapiro, didn't know what I was doing for setting up a proffer session; that no lawyer worth his salt would take a defendant in on a case like this; and that the U.S. Attorney's office would cross him up and use Legal Aid to do it." Tr., at 314. Schapiro in turn told Heatley that, in his experience, McCarthy was "definitely a straight shooter" and that their relationship was good. Schapiro assured Heatley that he had never seen the U.S. Attorney "cross up" a defendant in the manner Gottlieb described, and that the U.S. Attorney had an obligation to act in good faith and in his experience had always done so. In addition, Heatley expressed the concern that if he did proffer, McCarthy might not have the "juice"—i.e., the

---

1. Unless another date is indicated, "Tr." refers to the transcript of the hearings held December 2–5, 1997.

2. At the hearing held on this motion, Heatley waived the attorney-client privilege with respect to Schapiro so that he could testify. *See* Tr., 302–03.

**294**

authority within the U.S. Attorney's Office—to make the cooperation agreement happen. Schapiro told Heatley that he would make sure McCarthy's superiors were involved in the process. Schapiro also, however, shared these concerns to some extent and they "gave [him] pause about whether to bring [Heatley] in at all." Tr., at 317.

Schapiro relayed to McCarthy the information about the threats to persons that Heatley had told him; she asked Schapiro for some more details. The next day, August 20, Schapiro met with Heatley and got the necessary detail, which he then relayed in a phone call to McCarthy. Also during that conversation,[3] Schapiro conveyed his concerns to McCarthy about proffering Heatley. He told her he was concerned because "he was the lead defendant on this indictment and because he clearly had a significant criminal history, and ... I would not take him in and proffer him if at the end of the process they were just going to turn around and tell me, I'm sorry, we're just not going to sign him up because he's the lead defendant or because he was too bad a guy." Tr., at 325. McCarthy, in the first of three key assurances relied on heavily in Heatley's moving papers, told Schapiro that Heatley "would not be disqualified from getting a cooperation agreement simply because he was the lead defendant or because he was too bad a guy." *Id.* In McCarthy's words, she told Schapiro that "the fact that [Heatley] was a leader of the gang and had committed a number of murders would not rule him out as a cooperator." Tr., at 126.

Schapiro also asked McCarthy "to inform me if we ever reached a point during the proffer sessions where things were going wrong and it appeared that Mr. Heatley's chances of getting a cooperation agreement at the end were significantly in

jeopardy." *Id.* In this way, Schapiro could try to correct the problem or end the sessions. McCarthy assured him—the second key assurance relied upon by Heatley's motion—that she would let him know "if it wasn't going anywhere." Tr., at 151. McCarthy did not, however, agree to constantly evaluate Heatley's performance; she told Schapiro that it was her policy never to say to a person "how they're doing." Tr., at 71. Moreover, McCarthy told him that a final answer as to a cooperation agreement would not be forthcoming until after the end of the proffer sessions.

McCarthy also assured Schapiro that she would keep her supervisors abreast of what was happening and involved in the process—the third of the key assurances Heatley refers to. This assurance was in response to Schapiro's concerns about whether her level of authority in the USAO was sufficient to make a cooperation agreement happen. According to Schapiro, he took this to mean that McCarthy's supervisors would make a determination after each proffer session as to whether any more should be held, but McCarthy did not explicitly say this.

Finally, although Schapiro discussed with McCarthy the information that Heatley could provide on a number of homicides, he never asked her whether that would be enough, in light of what they knew of Heatley's activities, to warrant a cooperation agreement. Moreover, Schapiro did not ask whether Heatley would have to provide information on persons outside his alleged criminal enterprise (i.e., the "Crew") in order to obtain an agreement, nor did McCarthy make any representation as to the quantity or quality of information Heatley would have to provide. Schapiro also did not provide an attorney proffer of the information Heatley had to offer in order to ask the govern-

---

**3.** In their testimony, both Schapiro and McCarthy were unsure of precisely when the conversations to be described took place, as there were at least two, probably more, conversations prior to the first proffer session. Both were clear, however, as to the pertinent fact—i.e., that these conversations preceded the first proffer session on August 21.

ment to assess the likelihood of a cooperation agreement prior to the proffers.

In their phone conversation on August 19, Schapiro asked McCarthy what she expected to be the focus of the first proffer session on the 21st. McCarthy told him that because they knew so much about Heatley's activities, the discussion in the first session would not be limited to the charges in the indictment. McCarthy described the first session as a "truthfulness meter"—i.e., that they would be focusing on events largely known to law enforcement in order to assess Heatley's truthfulness and credibility.

As noted, on August 20 Schapiro met with Heatley at the MCC. Also during that meeting, Schapiro relayed to Heatley what McCarthy had said about the focus in the first session being truthfulness. Schapiro told Heatley "that it was critical if this was going to succeed that he be entirely honest and not hold back and not exaggerate anyone's roles and not minimize anyone's roles." Tr., at 318. Schapiro also told him that a cooperation agreement requires, at a minimum, that the cooperator be able to provide useful and truthful information about other persons' criminal activity. Finally, Schapiro also cautioned Heatley that a cooperation agreement was not a sure thing—that in Schapiro's experience, they usually had a "happy ending," but not always. The two also discussed the types of information Heatley might be able to provide, and Schapiro noted that Heatley could provide substantial information in around ten or eleven homicides, some of which, Schapiro believed, did not involve Heatley himself.

Despite this discussion, however, Schapiro admitted that he did not have full knowledge of Heatley's culpability prior to going into the first proffer session. Furthermore, Schapiro did not investigate the circumstances surrounding Heatley's post-arrest statement to determine whether

there was any significant basis on which to suppress it. The fact of the post-arrest statement made Schapiro more willing to take Heatley in to proffer, because he felt it made going to trial much more difficult.

The first proffer session took place on August 21, 1996, at approximately 10 a.m. Present at the proffer session were Heatley, Schapiro, McCarthy, and two NYPD officers. McCarthy presented Heatley with a standard proffer agreement used by the USAO. The agreement states, in relevant part, that (1) the USAO will not use any statements made by Heatley during the proffer session in its case-in-chief or at sentencing; (2) the USAO may use Heatley's statements as leads to other evidence which may be used against him; and (3) the USAO may use his statements for impeachment or rebuttal purposes should Heatley testify at trial. Finally, the agreement includes an integration clause which states that "no understandings, promises, agreements, and/or conditions have been entered into with respect to the meeting other than those set forth in this Agreement and none will be entered into unless in writing and signed by all parties." Gov.Hrng.Exh. 1; Def.Mot.Exh. H.

After a private discussion between Schapiro and Heatley, McCarthy and the agents returned to the room. McCarthy discussed the proffer agreement with Heatley, explained the provisions, and warned him that he could be, in effect, precluding the possibility of testifying on his own behalf at trial because it would open the door to the admission of his proffer statements.[4] McCarthy asked him if he understood the risks of continuing, and Heatley indicated that he did and signed the agreement.

After Heatley executed the agreement, McCarthy described the basic mechanics of cooperation to him. She told him that, in the federal system, he would have to

---

4. Heatley denies that McCarthy explained the agreement to him, but the Court credits McCarthy's testimony on this point.

basically tell everything he had done as well as everything he knew about others' activities. She said he would have to be absolutely truthful and that "after he had been fully debriefed, we would be able to determine whether or not a cooperation agreement could in fact be offered to him." Tr., at 34. She specifically told him, however, that there was no guarantee of a cooperation agreement. Heatley told McCarthy he wanted to cooperate, and asked her what he needed to do, to which she responded that he had to be completely honest and provide substantial assistance to the government. She also confirmed to Heatley her earlier assurance to Schapiro that she would keep her supervisors informed and involved in the decision process, and that she was not bringing Heatley in to proffer in bad faith—i.e., trying to milk Heatley for information when there was no hope of an agreement.

There were a total of five proffer sessions: August 21, 23, 27, 28, and 30, covering a total of between 20 and 25 hours. Prior to each session, Heatley signed a proffer agreement identical to the one described above except for the date. It is mostly unnecessary for purposes of this motion for the Court to relate the substance of Heatley's statements during the five sessions. Three points are important, however. First, Heatley's statements were, of course, largely inculpatory. Second, Heatley relayed information about criminal activity engaged in by others as well as himself. Third, however, most if not all of the information provided by Heatley—at least, the information to which he could testify to at a trial—related to the criminal activity of persons who were, in the government's opinion, under Heatley's control or part of the alleged enterprise run by Heatley.

At various points throughout the proffer sessions, McCarthy was skeptical of Heatley's truthfulness, skepticism based upon specific information available to McCarthy from independent sources which contradicted Heatley's statements. McCarthy expressed her skepticism to Heatley and Schapiro at various points, although according to Schapiro he took this as par for the course for a proffer session—i.e., that he had "never been in a cooperation situation or a proffer session where there isn't pushing, where there isn't skepticism, where the U.S. Attorneys simply take as a given everything that a defendant says to them and just accept everything without pressing him or her." Tr., at 348. Generally speaking, Schapiro felt these points of skepticism were resolved to everyone's satisfaction; no one, at least, specifically told him during the sessions that the government thought Heatley was lying about particular incidents. McCarthy also expressed concerns initially with Heatley's willingness to accept responsibility for his actions, but she did feel he made progress on that point throughout the sessions and communicated that to Schapiro. McCarthy testified, however, that by the end of the fifth session she felt Heatley had not either fully accepted responsibility or been completely honest.

At various times throughout the sessions, Schapiro asked McCarthy for an assessment of how Heatley was doing. McCarthy told Schapiro that it was not her practice to give a potential cooperator an ongoing assessment of "how he was doing"—that the assessment of the potential for a cooperation agreement could, and would, only be made at the end of the proffering process. McCarthy did, however, tell Schapiro that Heatley "had been making some progress in his candor." Tr., at 71.

At the beginning of the fourth proffer session, on August 28, McCarthy had become concerned that Heatley's expectations of the possible terms of cooperation were unrealistic. Accordingly, McCarthy discussed with Heatley and Schapiro her belief, based upon discussions with her supervisor, that any potential cooperation agreement would have to include a "floor"—i.e., rather than the typical cooperation agreement whereby complete dis-

cretion is left to the judge at sentencing, the agreement with Heatley would likely include a minimum acceptable sentence, probably about 20 years. McCarthy did not promise, however, that any cooperation agreement would in fact be forthcoming, only that if it were, Heatley should not expect it to be less than 20 years.

Also at this fourth proffer session, McCarthy reminded Heatley of the process for cooperation—namely, that there was no certainty of an agreement, but rather that the U.S. Attorney's office "would have to weigh what information Mr. Heatley was able to offer as against what he had done criminally himself to determine whether or not to give him an agreement." Tr., at 72. Schapiro testified that he was surprised at this "weighing" formulation, it apparently being the first time it was explicitly stated in this manner. Despite this surprise, Schapiro did not object to McCarthy's statement or stop the proffers because he believed that it was not intended as a significant change to the "ground rules," Tr., at 441, and also because by that point Heatley had already provided so much information that there was little choice but to continue to push for a cooperation agreement.

Later during the fourth session, apparently while McCarthy was not in the room, Agent Walsh asked Heatley for some information which Walsh could use to help "flip" another person into cooperation— i.e., information that only Heatley would know which the government could use to convince this person that Heatley was already cooperating. Heatley complied with Walsh's request.[5] According to Schapiro, he considered this a sign that the government was "considering [Heatley] a member of Team USA already in asking for his help in bringing other people onto the team." Tr., at 399. At the fifth proffer session, Heatley spent some time talking further to Walsh about others who might

be likely targets for cooperation and encouraging Walsh to work on those persons.

Throughout the process, McCarthy had been in almost daily touch with her supervisor, Elizabeth Glazer, in order to keep Glazer informed of what was transpiring during the proffer sessions. McCarthy mostly relayed the information that Heatley had provided, but on at least one important issue expressed her doubts to Glazer about the truthfulness of Heatley's statements. Despite these doubts, at no point during the proffer sessions did McCarthy tell Schapiro that she felt the proffering was "going nowhere"; moreover, neither she nor Glazer had come to that conclusion while the proffers were ongoing.

After the fifth session, Schapiro left to go on vacation. In McCarthy's view, the proffer sessions were not over—i.e., Heatley had not been completely debriefed at this point, at least as far as his complete truthfulness was concerned. She did, however, believe that they had fairly exhausted the areas of salient information which Heatley could provide. McCarthy prepared a memo which summarized the information received during the proffer sessions, which she gave to Glazer and Steven Cohen, deputy chief of the Violent Gangs Unit of the USAO. The memo was subsequently shared with Matthew Fishbein, chief of the Criminal Division, and the U.S. Attorney herself, Mary Jo White. On September 5, White, Glazer, Cohen, Fishbein, and McCarthy met to determine whether to continue the proffers; it was decided at that meeting that no cooperation agreement would be offered, and McCarthy was directed to hold no further sessions.

Following Schapiro's return from vacation on September 11, McCarthy called Schapiro to tell him that the offer of cooperation had been rejected by the U.S. Attorney. When asked why, McCarthy told Schapiro that "it was the office's view that

---

5. Following a hearing, this Court has found that Walsh did not use the information provided by Heatley, nor did that information

instigate or promote the cooperation of the other person.

[Heatley] had not provided significant information other than information about people under him in the crew ..." Tr., at 80. In Schapiro's words, "he had too much baggage, too much of a bad history, and that unless he would have been able to give them all sorts of other people besides those in his own crew" there would be no deal. Tr., at 406. McCarthy also expressed her personal view to Schapiro that she would have preferred to continue the proffer sessions, because she felt that "if I spent some more time with him I could get him to come around to the truth on many of the things that we had problems with." Tr., at 81. Schapiro and McCarthy also met briefly the next day, and Schapiro asked if there was any way possible to salvage an agreement; McCarthy responded that if Heatley had "other information about people of the same caliber in the criminal world that that might be worth a try with the office again." Tr., at 276. After Schapiro expressed an interest in attempting to pitch Heatley as a cooperator directly to McCarthy's superiors, a meeting was set up between them, but the meeting was canceled because Heatley requested that Schapiro be relieved in favor of present counsel.

On November 15, 1996, McCarthy, Glazer, and Heatley's new counsel, Joel Cohen and David Ruhnke, met to discuss, among other things, whether there was still a possibility of a cooperation agreement. Glazer began by stating that one reason for not offering a cooperation agreement was that, given Heatley's record, it would be unreasonable to expect any judge to give a substantial downward departure regardless of the extent of his assistance. Ruhnke responded that that was a risk Heatley was willing to take. Glazer then stated that the other reason for denying him a cooperation agreement was that Heatley had primarily provided information against his own crew. Glazer also told the new defense counsel that one of the problems the U.S. Attorney's office had with Heatley was that they did not believe he had been completely truthful in his proffers, although Ruhnke in his testimony and Cohen in an affidavit disputed that Glazer made this statement. She further stated that, should Heatley have information in other areas, the government would be willing to accept an attorney proffer as to the information he could provide and would take the new information into account.

Subsequently, on December 31, 1996, McCarthy, Glazer, Ruhnke, Joel Cohen, Steven Cohen, Gregg Sofer, a special AUSA, and Dan Rather, of the New York County District Attorney's office, met to discuss further the possibility of cooperation. Ruhnke and Joel Cohen provided an attorney proffer which summarized for the group the additional information which Heatley could provide if he were to be a cooperator. Steven Cohen told defense counsel that the office would consider the additional information and get back to them. Within a couple of weeks, the government told defense counsel that no cooperation agreement would be forthcoming.

On May 2, 1997, Ruhnke and Cohen met with representatives of the U.S. Attorney's office, including among others McCarthy and Steven Cohen; the purpose of the meeting was for Heatley's defense counsel to attempt to persuade the office not to seek authorization to pursue the death penalty against Heatley. At this meeting, part of Ruhnke's argument was that Heatley had been willing to proffer through five sessions with the government; no one at this meeting suggested that Heatley had not been honest in his proffers.

Finally, on September 12, 1997, a similar meeting was held with the Attorney General's capital review committee in Washington, D.C. Again, Ruhnke argued that Heatley had proffered truthfully, and that this was a reason not to seek the death penalty. This time, McCarthy interjected that no, Heatley had not been completely honest. Ruhnke testified that this was the first time he had been confronted with an

accusation that Heatley had been less than truthful in his proffer sessions.

Heatley has now moved this Court to dismiss the superseding indictments in this case, based on the government's alleged breach of various obligations with respect to the proffer sessions and the allegation that the superseding indictments were obtained directly or indirectly from the statements made by Heatley during those sessions. In the alternative, Heatley seeks specific performance in the form of an order from this Court requiring the USAO to give Heatley a cooperation agreement.

## DISCUSSION

### I. Breach of Assurances & the Duty of Good Faith

Heatley's first argument is that the United States Attorney's office breached obligations it assumed when it undertook to bring Heatley in for proffer sessions. Heatley bases this claim in part on the government's alleged breach of the three express assurances McCarthy gave Schapiro prior to the first proffer session. Heatley claims that each of these express assurances gives rise to a claim for breach of contract or promissory estoppel.[6] Heatley also argues the broader point that the USAO breached its duty of good faith in denying Heatley a cooperation agreement.

### A. Breach of Express Assurances

 It is well-settled that when the a defendant waives rights in reliance upon a government promise, due process requires that the defendant be entitled to have the government held to its end of the bargain. Thus, for example, promises in a plea agreement are binding upon the government, *see Mabry v. Johnson,* 467 U.S. 504, 509, 104 S.Ct. 2543, 2547, 81 L.Ed.2d 437 (1984); *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971); *United States v. Salameh,* 152

F.3d 88, 120 (2d Cir.1998); *United States v. Knights,* 968 F.2d 1483, 1486 (2d Cir. 1992). Likewise, a suspect's post-arrest statements may be deemed involuntary if induced by the government's unfulfilled or unfulfillable promises. *See United States v. Ruggles,* 70 F.3d 262, 265 (2d Cir.1995); *United States v. Fisher,* 700 F.2d 780, 783 (2d Cir.1983). The Court can see no logical reason why the government should not equally be held to its assurances if those assurances were relied upon by the defendant in deciding whether to enter a proffer session. A defendant entering a proffer session is waiving valuable rights—first and foremost, his or her Fifth Amendment right not to incriminate oneself—which, even if that waiver is mitigated somewhat by the government's agreement not to use the statements directly in its case-in-chief, still may provide substantial leads or material for impeachment which the defendant would otherwise be free not to provide. In order for the waiver of these rights to be truly knowing, voluntary, and intelligent, there must be some assurance that the promises made by the government which induce that waiver will be enforced.

The Court, further, has no difficulty finding that McCarthy did, in fact make the three assurances alleged by Heatley, and that Heatley relied upon those assurances in making his decision to proffer. Schapiro's testimony made it clear that both he and Heatley were concerned about the risks going into a proffer, and that Schapiro sought the assurances made by McCarthy prior to the proffer session precisely for the purpose of lessening the risks involved. Had those assurances not been given, Schapiro would in all likelihood not have advised Heatley to proffer.

 There is actually little dispute between the parties over the facts surrounding these promises—i.e., what was said, and what was done. The disagreement between Heatley and the govern-

---

6. Although Heatley urges both contract and promissory estoppel theories, given the Court's determination that no express promises were breached by the government, it is unnecessary to differentiate between these two theories.

ment over whether the government breached any of its promises boils down primarily to a dispute over the interpretation of McCarthy's promises. In construing language in a plea agreement, the courts look to the "reasonable understanding of the parties, and resolve any ambiguities in the agreement against the government." *United States v. Rodgers,* 101 F.3d 247, 253 (2d Cir.1996), *cert. denied,* 520 U.S. 1188, 117 S.Ct. 1472, 137 L.Ed.2d 685 (1997); *see also United States v. Carbone,* 739 F.2d 45, 46 (2d Cir.1984) ("In determining whether a particular plea agreement has been breached, we look to 'what the parties to the plea agreement reasonably understood to be the terms of the agreement.' ") (quoting *Paradiso v. United States,* 689 F.2d 28, 31 (2d Cir. 1982)). With these principles in mind, the Court turns to each of the three assurances.[7]

**7.** Relying on the parol evidence rule, the government, in its original briefing on this issue, argued that the "integration clause" of the signed proffer agreements bars this Court's consideration of the three promises made by McCarthy. While the government did not continue to press this point in its post-hearing memoranda, the Court finds such an argument both questionable and troubling. Although promises made in the context of proffer agreements are generally to be construed under contract law principles, *see United States v. Liranzo,* 944 F.2d 73, 77 (2d Cir. 1991); *cf. United States v. Yemitan,* 70 F.3d 746, 747 (2d Cir.1995) (plea agreements), the Second Circuit has made it quite clear that a defendant's rights are grounded in more than contract, and thus contract principles, while useful, do not completely define the obligations of the parties. " 'Plea agreements are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain.' " *United States v. Ready,* 82 F.3d 551, 558 (2d Cir.1996) (quoting *Carnine v. United States,* 974 F.2d 924, 928 (7th Cir.1992)); *see also United States v. Harvey,* 791 F.2d 294, 300 (4th Cir. 1986) (in plea agreement context, defendant's " 'contract' right . . . reflects concerns that differ fundamentally from and run wider than those of commercial contract law. . . . [T]he courts' concerns run even wider . . . to concerns for the honor of the government, public confidence in the fair administration of justice, and the effective administration of justice

### 1. *Heatley Would Not Be Ruled Out Based on his Culpability*

■ The first assurance given by McCarthy to Schapiro was that Heatley would not be ruled out from a cooperation agreement on the grounds that he was, in Schapiro's words, "too bad a guy." The precise meaning of this promise is the crux of the dispute between Heatley and the government in this case. The government's position is that this promise meant, in effect, that despite his extensive (in the government's opinion) criminal culpability, they would still in good faith consider making Heatley a cooperator if he could prove valuable enough in that role—i.e., if he gave them sufficiently valuable information and was truthful during the proffer sessions. Heatley's position is that this promise was much stronger—namely, that Heatley's culpability would not even be a

in a federal scheme of government.") (quoted in *Ready,* 82 F.3d at 558). The parties to a proffer agreement are not commercial entities bargaining from positions of equality, and the rights being bargained away are of the utmost importance. The Court finds it at least a difficult question whether it would offend the fundamental notions of fairness inherent in due process to allow the government to induce waivers of constitutional rights via promises, then escape those promises by use of a general disclaimer in a standard-form proffer agreement, at least without evidence that the clause and its effects were specifically discussed and understood by the defendant. The Second Circuit has apparently never reached the issue, and the only district court in this circuit to discuss an integration clause in a plea agreement gave it effect, but as against the *government's* claim that the *defendant* made promises not contained in the plea agreement, obviously a case implicating different concerns. *See United States v. Mozer,* 828 F.Supp. 208, 213 (S.D.N.Y.1993) (Leval, J.); *see also United States v. Floyd,* 1 F.3d 867, 870 (9th Cir.1993). Other circuits have addressed the issue and given these clauses in plea agreements effect against a defendant. *See United States v. Guzman,* 85 F.3d 823, 829 (1st Cir.), *cert. denied,* 519 U.S. 1020, 117 S.Ct. 537, 136 L.Ed.2d 422 (1996); *United States v. Rutledge,* 900 F.2d 1127, 1132 (7th Cir.1990). Given the Court's finding that the express assurances were not breached, it need not reach this argument, however.

factor in the decision whether to offer him a cooperation agreement.

Heatley's position is simply unreasonable. No reasonable person could have understood McCarthy's promise—even phrased in Schapiro's words, i.e., that Heatley "would not be disqualified from getting a cooperation agreement simply because he was the lead defendant or because he was too bad a guy"—to mean that his culpability would not be weighed in the balance. To accept this interpretation is to accept that the position that, as long as Heatley was truthful, McCarthy had promised to grant a cooperation agreement regardless of how minimally useful his information was. Obviously, no prosecutor would ever agree to such a thing, and no defense counsel could reasonably believe otherwise. Even Schapiro, when pressed

by this Court during his testimony, could not say that was really his understanding of the assurance.[8] The closest he came was that he thought that they "had already weighed" his criminal history. Obviously, this makes no sense, in that it was impossible for the government to weigh his history against either the substantiality of his assistance or his honesty *prior* to the proffer sessions, the very purpose of which is to allow the government to find out what information he has to offer and to test his credibility.

Schapiro also testified that when McCarthy told Heatley that he needed to be truthful and to provide "substantial assistance," that he took this to mean the same thing as "substantial assistance" does in the U.S. Sentencing Guidelines, namely, "substantial assistance in the investigation

8. Court: Let me stop you, Mr. Schapiro. With respect to those assurances, did you understand her assurance to be that his being too bad a guy wouldn't disqualify him from being given a cooperation agreement, that the severity of his crimes would not be weighed by the U.S. Attorney's Office in assessing whether to give him the cooperation agreement?

Schapiro: I understood it to mean that they had already weighed, at least to a large extent, the severity of his crimes and had decided that the severity of his crimes notwithstanding they wanted to bring him into see if he could give them honest testimony that would substantially assist in the prosecution of others and that, if he could, they weren't going to come back to me and say, we can't sign him up because he's a bad guy or the lead defendant.

Court: I'm not sure you've answered my question. Did you assume by that assurance or understand by that assurance that they would not weight the severity of his crimes against other factors like whether his cooperation was in fact substantial or substantial enough?

Schapiro: I understood it to mean—I certainly didn't believe that it would be as if he had no criminal history or that they might not have had concerns about him being a bad guy. But, again, she had indicated to me that they knew all about his criminal history, so I certainly did not understand it to mean that if he were honest and could help them prosecute some other people that the fact that he's a bad guy would end up

preventing him from getting an agreement, if that's not too roundabout an answer.

Court: It still is because I don't know if you've answered my question directly. Did you believe that they would not consider the severity of the crimes in weighing how substantial his cooperation was?

Schapiro: I guess I believed that they could weight it or consider it but that by inviting him in to talk, knowing what they knew about him, that they were indicating to me that they believed that there was at least some strong chance that he was going to be able to, despite that, get an agreement. In other words, I certainly didn't believe that it meant that he had to—that he could only get an agreement if he came in and could solve the World Trade Center bombing and Oklahoma City, which—it wasn't an indication that, this guy is really so bad, but, of course, we're willing to listen to him and if it turns out that he's the greatest crime solver that we've ever interviewed then we may give him an agreement, I did not understand that hose were the terms of the understanding.

Court: let's go back to my question: did you believe that they would not use the severity of his crimes in weighing whether his assistance was substantial and warranted an agreement?

Schapiro: I guess the answer is yes, I did not believe—well, I believed that they had already weighed it. So that answer was making the answer difficult—

Tr., at 328–30.

or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1. Again, when pressed, he would not say that he understood this literally—i.e., that substantial assistance in the prosecution of one other person for any federal crime, no matter how minor, would suffice to trigger an obligation on the part of the government to offer him a cooperation agreement—but he did say that "we knew that he was going to be cooperating, it was understood, against the people in what the government called the Preacher crew." Tr., at 370. If Schapiro "understood" this, it was certainly not because of any assurances given by McCarthy, who, as noted earlier, gave no indication whatsoever of the type of information which would suffice to win Heatley a cooperation agreement.

The only reasonable interpretation of McCarthy's promise is that, given what the government knew (or suspected) of Heatley's criminal past, he would not be ruled out of the possibility of a cooperation agreement, provided that he was truthful and provided assistance which was substantial enough, in the government's assessment, to warrant allowing a plea to lesser charges. McCarthy did not promise that the government would or would not consider any particular factors in assessing the substantiality of Heatley's assistance. Heatley makes a point that McCarthy never said that he would have to provide assistance in prosecuting those outside the Preacher's Crew, but of course, she never said the contrary either, and at least for purposes of a breach-of-promise analysis, that is the key issue. The government cannot be held to promises which it did not even impliedly make.

With McCarthy's assurance so interpreted, it becomes clear that the government did not breach it. The only way, it seems, this promise could have been breached is if the government knew, at some point prior to the end of the proffers, that there was no reasonable chance for Heatley to earn a cooperation agreement. There is no evidence of this fact. The sole

piece of evidence which Heatley points to is the fact that Elizabeth Glazer, at the November 15 meeting with Ruhnke and Cohen, stated that one reason for denying Heatley a cooperation agreement was that, with his past, no judge could be expected to grant Heatley any substantial downward departure. If this were the sole reason for the government's decision, there might be a basis for Heatley's claim that the government breached its promise, given the government's professed knowledge of Heatley's criminal activities. However, Glazer's statement in full context does not support the conclusion that the government's decision was based solely or even principally on the improbability of a downward departure. For one thing, McCarthy was present at the meeting at which the decision was made, and she never mentioned this as a basis for decision to Schapiro on the two occasions at which they discussed the reasons for the denial. Nor did McCarthy testify directly that this was a reason. Nor was this ever stated as a reason to defense counsel other than this one time. It is much more likely that Glazer was trying to deflect the concerns of Heatley's defense counsel at the November 15 meeting by attempting (unsuccessfully, one might add) to convince Ruhnke and Cohen that the denial of the cooperation was, in effect, harmless. Whatever the reason for the statement, the Court does not find that this statement represents evidence of a breach of the government's promise.

### 2. *McCarthy Would Keep Her Supervisors Informed*

██ The second assurance made by McCarthy was that she would keep her supervisors apprised of the content of the proffer sessions. As McCarthy testified, she did not have the authority to grant or deny a cooperation agreement, so this assurance was designed to make sure that those who did—namely, her supervisors—would be informed on an ongoing basis. The importance of this assurance becomes

clear when coupled with the third promise—that McCarthy would inform Schapiro if it "wasn't going anywhere." The need to keep the supervisors informed was important because that way, if those in charge ever reached the point where, based on reports of McCarthy, it became obvious that no deal would be forthcoming, the proffer sessions could be stopped immediately. Clearly, if her supervisors were not kept so informed, they would have no way of making this assessment.

Addressing first only the promise to keep her supervisors informed, McCarthy testified that she was in daily contact with Glazer and, while not giving Glazer a complete rundown of everything Heatley said, McCarthy gave Glazer a general idea of the scope of the proffer sessions. Moreover, on at least one occasion McCarthy told Glazer of a concern she had for Heatley's veracity and acceptance of responsibility. The Court has no reason to disbelieve McCarthy's testimony on this point, and Heatley has adduced no evidence to suggest that McCarthy did not live up to her promise.

3. *McCarthy Would Let Schapiro Know if it "Wasn't Going Anywhere"*

█ Finally, McCarthy promised that she would let Schapiro know if there ever came a time when the proffering "wasn't going anywhere." As with the first assurance, there is some difference in the interpretation of this promise. Heatley appears to argue that this promise required McCarthy to apprise Schapiro and Heatley immediately of any position taken by Heatley which, if ultimately held to, would prove fatal to a cooperation agreement. The government's position, on the other hand, is that the most this promise meant was that if McCarthy (or her superiors) ever reached the point where they felt that further proffering was pointless because there was no reasonable chance of a deal, then McCarthy would inform Heatley and Schapiro of that fact.

The government's interpretation is the only reasonable one in light of the proffering process. As the government correctly points out, and as McCarthy directly stated to Heatley, a great part of the proffer process is a means for determining the credibility and veracity of the potential cooperator. If the government immediately responded to the defendant every time he said something with which the government disagreed, the potential cooperator would be able to tailor his statements to meet the government's expectations, and the value of the proffers as a "truthfulness meter" would be severely impaired. In fact, requiring otherwise might even work against cooperators, in that once the government clearly expressed that it had reason to believe the profferer was lying, any change to the potential cooperator's story would have far less credibility than if he came around spontaneously. It is not unreasonable for the government to simply urge the potential cooperator to tell the truth, then take his statements and judge for themselves whether he is doing so.

Moreover, as McCarthy testified, it is not uncommon for a potential cooperator to come the truth gradually rather than to be completely honest from the start, particularly if the crime is one for which it is particularly difficult to take responsibility. Often a prosecutor can, by continuing to press the profferer, bring him around to the truth, and McCarthy testified that that is precisely what she felt was going on during the sessions—that Heatley was "making progress." Given this reality, it would not be fair to say, immediately upon the first problem the government had with Heatley's testimony—even a fairly major problem—that the proffer sessions had reached the point of "not going anywhere."

In fact, McCarthy testified that she did not feel they had reached any point that represented an impasse so difficult that it was unlikely to be overcome. McCarthy felt that she was developing a rapport and a trust with Heatley and was convinced that she could bring him around on any

problems. However optimistic this might have been on McCarthy's part, the relevant fact is she never considered the proffer sessions to be going nowhere, and this Court credits her testimony on this point. The government therefore did not breach this last assurance.

### B. *The Good Faith of the Government's Denial*

■ Heatley's next claim is a more general assertion that the government acted in bad faith when it denied Heatley a cooperation agreement. The first question to be addressed is the scope of review which this Court has over the government's decision. Heatley relies upon the line of Second Circuit cases dealing with the government's refusal, as part of a plea agreement, to make a substantial assistance motion under U.S.S.G. § 5K1.1, and the courts' ability to scrutinize that refusal for good faith. *See United States v. Imtiaz*, 81 F.3d 262, 264 (2d Cir.1996); *United States v. Leonard*, 50 F.3d 1152, 1157–58 (2d Cir.1995); *United States v. Knights*, 968 F.2d 1483, 1486–88 (2d Cir.1992); *United States v. Khan*, 920 F.2d 1100, 1104–05 (2d Cir.1990); *United States v. Rexach*, 896 F.2d 710, 712–14 (2d Cir. 1990). The government, in response, argues that, absent an agreement, the government's refusal can only be scrutinized for unconstitutional motivation. *See Wade v. United States*, 504 U.S. 181, 185–86, 112 S.Ct. 1840, 1843–44, 118 L.Ed.2d 524 (1992).

In *Rexach*, the Second Circuit outlined the principles for judicial review of prosecutorial discretion to make substantial-assistance motions under U.S.S.G. § 5K1.1. *Rexach* held that, where a plea agreement includes an obligation by the government to make a § 5K1.1 motion in exchange for the defendant's cooperation, the prosecutor's decision not to make the motion is judicially reviewable. This is so even if the determination of whether the defendant has rendered "substantial assistance" is expressly left to the discretion of the prosecutor. The prosecutor's discretion is not completely unlimited because there is an implied obligation of good faith and fair dealing in every contract. The scope of the government's discretion, though broad, does not "permit it to ignore or renege on contractual commitments to defendants."

Of course, where the government has made no contractual commitments, such as when there is no cooperation agreement, the government is free to refuse to make a substantial-assistance motion on any ground it chooses, limited only by the obligation that limits all prosecutorial decisions—the obligation to uphold the constitution. Thus, only if the decision is based on "such impermissible considerations as race, religion, or the desire to prevent the defendant's exercise of constitutional rights" may the decision be overturned. *Rexach* may be summed up this way: the prosecution may never base its decision on an unconstitutional motive, and the government will be held to any commitments it makes.

■ Concomitant with these principles, the Second Circuit in later cases laid out the procedure to be followed when a defendant challenges a prosecutor's decision not to make a § 5K1.1 motion. Where there is no cooperation agreement—i.e., no commitment on the government's part to make a motion under any circumstances—the defendant may only challenge an unconstitutional motivation, and must therefore present evidence of, and prove, such a motive. To warrant a hearing on such a claim, the defendant must make a "substantial threshold showing." *Wade*, 504 U.S. at 186, 112 S.Ct. at 1844. Where, however, the government has undertaken a commitment to make a motion, a defendant can subject the government's failure to do so to more searching review, *see Leonard*, 50 F.3d at 1157, and his or her burden to gain an evidentiary hearing is correspondingly lower.

■ In such cases, there is a three-step procedure to trigger judicial review of

the prosecutor's decision. First, the defendant "must first allege that he believes the government is acting in bad faith." *Imtiaz,* 81 F.3d at 264 (quoting *Khan,* 920 F.2d at 1106). This shifts the burden to the government to " 'rebut this allegation by explaining its reasons for refusing to depart.' " *Id.* (quoting *Knights,* 968 F.2d at 1487). The burden is then on the defendant to "make a showing of bad faith to trigger some form of hearing on that issue." *Id.* Such a showing may be made if "the government's reasons are wholly insufficient" or "the defendant's version of events, supported by at least some evidence, contradicts the government's explanation." *Id.*

With these principles in mind, the Court turns to the case at hand. There was, of course, no cooperation agreement in this case, so *Rexach* and its progeny are not directly applicable. However, the Court sees no reason why the principles underlying these cases are not fully applicable. Thus, as the government concedes, its decision not to give Heatley a cooperation agreement cannot be based on an unconstitutional motive, a point addressed later in this Opinion. The more disputed question is whether the government undertook any specific commitments to Heatley in setting up the proffer sessions (other than the three discussed earlier). The government contends that it did not, and that therefore this Court has no power to review its decision not to offer Heatley an agreement. The Court disagrees, but only to a very limited extent.

When the government sat down with Heatley for the proffer sessions, it made one commitment: that the U.S. Attorney's office would consider in good faith whether to offer Heatley a cooperation agreement. This promise is implicit in the very structure of the proffer session/cooperation process—needless to say, most defendants would not simply walk in and, in effect, confess to the charges against them without some possibility of leniency. It is, moreover, implicit, if not explicit, in every-

thing McCarthy told Heatley prior to the first proffer session about the cooperation process. *See, e.g.,* Tr., at 34 ("After he had been fully debriefed, we would be able to determine whether or not a cooperation agreement could in fact be offered to him."); *id.* (describing benefits of cooperation agreement to Heatley); *id.* at 35–36 (information would be reviewed with supervisors to decide whether or not to offer a cooperation agreement).

Thus, in contrast to the situation in which there is no agreement, the government here has undertaken some commitment which this Court finds is subject to judicial review—namely, a commitment to give good-faith consideration to offering Heatley a cooperation agreement. To state this commitment, however, is to state how minimal a commitment this really is— and, correspondingly, how minimal the scope of judicial review is. Unlike the situation in which the government actually has an obligation to make a motion which is triggered by the defendant's substantial assistance—and which a court is competent to review to determine whether the government has any good-faith basis for claiming that obligation has not been triggered—the government here undertook no such commitment to Heatley—that is, the government never said that upon fulfillment of certain conditions, Heatley would receive a cooperation agreement.

The most that could be said is that the government promised that, if Heatley were truthful and his information were sufficiently useful, he would get a cooperation agreement, but it is immediately apparent that the nature of this "sufficiently useful" condition is much different than the conditions upon which the government's obligations in, for example, *Knights* rested. In *Knights,* the plea agreement required the defendant to "provid[e] truthful information and testimony" and to "appear[ ] at such grand jury proceedings, hearings, trials, and other judicial proceedings" as required by the U.S. Attorney. *See Knights,* 968 F.2d at 1487. All that was ever asked

of the cooperator was to testify at the trial of a codefendant, which he did. The government refused to make a § 5K1.1 motion, citing among other things the fact that Knights' testimony was inconsistent with that·of another witness. The Second Circuit held that this was an insufficient reason, despite the fact that the plea agreement gave the U.S. Attorney "sole and unfettered discretion" whether to make the motion, because all that was required of the cooperator was truthful testimony. Moreover, the court noted, although a court is usually obliged "to allow considerable deference to the government's evaluation of a defendant's cooperation," because the cooperation agreement only required truthful testimony, "the district court [was] well-situated to review the defendant's performance of his obligations under the plea agreement." *Id.* at 1488.

In contrast to *Knights,* however, whether a defendant's information is useful to the government is an assessment uniquely available to the prosecution, for it rests on many considerations known only to the government, not the least of which is the value of pursuing prosecutions against the potential cooperator and those against whom his information is potentially useful. Not only is this an assessment which courts are patently not competent to make, even if they were, to do so would represent a judicial invasion of Executive Branch prerogatives that almost certainly would be unconstitutional.

 Thus, this Court's review of the decision not to offer Heatley a cooperation agreement is limited to one question: did the government give good-faith consideration to making Heatley a cooperator?

The Court has no evidence that it did not. McCarthy testified that the decision to deny an agreement and stop the proffer sessions was made at a meeting of her supervisors, based upon McCarthy's report of the sessions. Further, the topic of a possible cooperation agreement was reopened at the November 15 meeting and discussed again at the December 31 meeting. There is thus every indication that the decision was carefully considered.[9] Moreover, the reason for denying Heatley an agreement—namely, that the value of his cooperation was insufficient to outweigh his culpability—does not begin to approach the level of unsupportability on the record that would be necessary to find bad faith.

Moreover, it is clear that Heatley is not entitled to further evidentiary hearings on the government's good faith. Applying the procedure set forth in *Khan* and its progeny, Heatley has presented no evidence which contradicts the government's version on the issue of its good faith consideration. The Court finds that the government did not breach its obligation of good faith consideration under the proffer agreements.[10]

## II. *Unconstitutional Motivation*

 Heatley also asserts that there is evidence suggesting an unconstitutional motive on the part of the government in denying Heatley a cooperation agreement—namely, that the decision was made on the basis of (1) Heatley's race, or (2) the desire of the Southern District U.S. Attorney's Office to bring its first capital prosecution. As proof of this fact, Heatley

9. The Court is not suggesting that any particular decision-making process would be required to satisfy the government's obligation, only that these meetings constituted more than sufficient evidence of good-faith consideration.

10. This holding also disposes of Heatley's claim that the government failed to follow its own procedures. McCarthy conceded in her testimony that the policy of the U.S. Attorney's office was that a decision whether to offer a cooperation agreement could not be made arbitrarily, capriciously, or in bad faith. *See* Tr., at 121–22. Assuming the USAO's internal policies provide a basis for a claim by defendants that those procedures were not followed, those policies do not appear to impose obligations on the USAO that go any further than the obligation of good faith discussed above.

cites to evidence of various white defendants who received cooperation agreements "despite criminal conduct that far exceeded that which Heatley allegedly committed." Def.Rep.Supp.Mem., at 7. Heatley does not contend that this point has been proven, only that the evidence presented warrants further discovery as to the government's decisionmaking processes.

As noted, the government concedes that its decision not to offer Heatley a cooperation agreement cannot be based on an unconstitutional motive, such as discrimination on the basis of race or religion, or the desire to prevent the exercise of constitutional rights. *See* Gov't Opp. Mem.Supp., at 9; *Wade,* 504 U.S. at 185, 112 S.Ct. at 1843–44 (1992) (prosecutor's decision not to move for downward departure based on substantial assistance subject to review for unconstitutional motive); *United States v. Brechner,* 99 F.3d 96, 99 (2d Cir.1996) (same). Nor can the government's decision be wholly arbitrary—i.e., it must be rationally related to a legitimate government objective. *See Wade,* 504 U.S. at 186, 112 S.Ct. at 1844. The government contends, however, that there is no evidence to support the defendant's claim.

■ As noted, Heatley does not contend that he has proven his claim, merely that he has shown enough to warrant further discovery. While Heatley's claim is not precisely the same as the selective prosecution claim pressed in *United States v. Armstrong,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), in that Heatley challenges not the initial charging decision as in *Armstrong* but rather the government's continued prosecution in the face of an offer to cooperate, the Court sees no reason why the threshold showing for discovery should differ from *Armstrong* on that ground. As in *Armstrong,* Heatley's claim asks the Court "to exercise judicial power over a 'special province' of the Executive." *Id.* at 464, 116 S.Ct. at 1486. The factors going into the prosecution decision in *Armstrong* —"the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan" *id.* at 465, 116 S.Ct. at 1486—and which were held to be "not readily susceptible to the kind of analysis the courts are competent to undertake," *id.,* are all present in the government's decision not to offer a cooperation agreement to Heatley. In fact, there is at least one more factor to add to the list—the value of Heatley's assistance to the government, an assessment only possible, if at all, if the government were to reveal the evidence already available to it in the cases for which Heatley possibly could have supplied assistance. Even more so than in *Armstrong,* the concern "not to unnecessarily impair the performance of a core executive constitutional function," *id.,* is particularly high in evaluating decisions to offer cooperation.

■ In order to establish entitlement to discovery on a selective prosecution claim, the defendant must present " 'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." *Id.* at 468, 116 S.Ct. at 1488 (quoting *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974)). In order to establish discriminatory effect, the defense must, at a minimum, produce "some evidence that similarly situated defendants of other races could have been prosecuted, but were not...." *Id.* at 469, 116 S.Ct. at 1488. As for intent, this may be established by, among other things, direct evidence of intent (perhaps in the form of statements by the decisionmaker) or circumstantial evidence of disproportionate impact. *See United States v. Armstrong,* 48 F.3d 1508, 1513 (9th Cir.1995), *rev'd on other grounds,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *see also Batson v. Kentucky,* 476 U.S. 79, 93, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986) ("Circumstantial evidence of invidious intent may include proof of disproportionate impact"); *cf. Catanzaro v. Weiden,* 140

F.3d 91, 96 (2d Cir.1998) (statistical evidence plus comments by decisionmaker preclude summary judgment on issue of invidious intent in equal protection claim).

As to discriminatory effect, Heatley provides evidence, in the form of affidavits and testimony from his defense counsel, of five defendants—all white—who received cooperation agreements despite committing crimes allegedly as serious as those charged against Heatley. *See* Futerfas Aff.; Tr., at 502–04. Even assuming that Heatley's counsel are competent to testify as to these five cooperators, this evidence is insufficient to establish the discriminatory effect prong. First, the affidavits only allege that these defendants were offered cooperation agreements by "the government," and do not assert that they were offered by the Southern District of New York U.S. Attorney; the most stated is that two of these men have testified in Southern District cases. Even assuming, however, that the relevant decisionmaker against whom selective prosecution is being alleged is the United States government as a whole (as embodied, perhaps in the Attorney General), there is insufficient evidence from which to conclude, even as a prima facie showing, that these defendants are "similarly situated" to Heatley, for we know nothing about these five cooperators other than the number of murders and other crimes allegedly committed. We know nothing about these defendant's positions in their relevant organizations, and importantly, there is no evidence of the quantity or quality of assistance provided by these cooperators. Given the importance of this factor in the Heatley denial, it is impossible to determine if these defendants are similarly situated, and this Court will not lightly presume these facts given the "substantial threshold showing" required for an evidentiary hearing. *See Wade*, 504 U.S. at 186, 112 S.Ct. at 1844;

*Armstrong*, 517 U.S. at 468, 116 S.Ct. at 1488 (requiring "rigorous" standard for discovery in a selective prosecution claim).

Even were this a sufficient showing of discriminatory effect, however, there is no evidence of discriminatory intent. The sole piece of evidence offered [11] is the remark by Elizabeth Glazer at the November 15 meeting, in which she said that one reason for denying Heatley a cooperation agreement was the low probability that, given the crimes alleged, any judge would entertain a serious downward departure. In light of the five cases cited, Heatley says, Glazer must have known this statement to be false and, therefore, it "only makes sense if Ms. Glazer devalued Heatley's cooperation compared to similarly situated white defendants." Def. Rep.Supp.Mem., at 7. The Court will not join Heatley in this extraordinary inferential leap. While, as noted earlier, the Court is inclined to agree with the defense that Glazer's statement was probably disingenuous—i.e., the risk that Heatley might cooperate yet receive no benefit from a sentencing judge is highly unlikely to be more of a concern to the USAO than to the defendant himself—such dissembling hardly suggests *racial* animus.

As for Heatley's argument that the denial was due to a desire on the part of the Southern District office to pursue a capital case, that claim fails as well. First, while this Court would hope that no member of the U.S. Attorney's office would reject a cooperation agreement and pursue a prosecution solely for the purpose of getting his or her first death sentence, it is far from clear that such a motive would be unconstitutional, provided that the prosecution could in good faith assert that the defendant had committed a capital crime which was of sufficiently unusual severity to "warrant" the death penalty. The gov-

---

11. Defendants do not argue that the evidence of the five other cooperators, by itself, raises an inference of discriminatory intent, nor could they. While an inference of discriminatory intent may arise from a statistically disparate impact of sufficient magnitude, this sample is far too small to give rise to any inference of discrimination whatsoever. *See, e.g., Pollis v. New School for Social Research*, 132 F.3d 115, 121 (2d Cir.1997).

ernment could believe that the deterrence value of the death penalty is severely undermined by a complete lack of capital prosecutions, and whether this Court would agree with that assessment or not, it would be difficult to conclude that such reasoning runs afoul of the minimal standards of the rational-basis test. Having failed to make the required "substantial threshold showing" on the claim that the decision to deny Heatley a cooperation agreement was based on an unconstitutional motive, the Court denies the request for further discovery on this issue.

### III. *Mutual Mistake*

Heatley also argues that, should this Court disagree with his breach of promise and bad faith arguments, rescission of the proffer agreements is warranted based upon "mutual mistake"—in this case, the apparent difference in meaning attached to McCarthy's first promise. Schapiro believed that this promise meant that Heatley's culpability would not be weighed at all in the decisionmaking process, while McCarthy believed that it meant his culpability would not automatically rule Heatley out as a cooperator if he provided sufficiently substantial assistance. As noted, this Court has found McCarthy's interpretation to be the reasonable meaning of the assurance.

To begin with, Heatley is incorrect to argue that this disagreement is governed by the contract doctrine of mutual mistake. The mutual mistake doctrine concerns only mistakes as to *facts* existing at the time of contract formation. *See, e.g.,* Restatement (Second) of Contracts §§ 151, 152. Moreover, the mistake here was obviously not "mutual," in that both parties shared the same erroneous assumption, but rather it is unilateral. Heatley's claim is, instead, one of misunderstanding as to the meaning of the

promise and, thus, a failure of mutual assent.

It is clear that, under general contract law principles, a party may not be bound by the meaning attached to a promise by the other party if the first party had no reason to know of the other party's meaning. *See* Restatement (Second) of Contracts § 201(3). Thus, the government cannot in anyway be said to be bound by the meaning Heatley and Schapiro attached to McCarthy's promise, particularly since that meaning (if actually held) was an unreasonable one.

Nor is there, assuming that there was a failure of mutual assent, a restitutionary remedy available to Heatley (restitutionary in the sense of "restoring" the inculpatory statements by forbidding the government the use of that information or any fruits thereof).[12] One must take a step back from the contract language surrounding this motion and realize that such a remedy would be, in effect, asking the Court to suppress Heatley's statements during the proffer sessions on the grounds that his waiver of his Fifth Amendment rights was somehow not voluntary given Heatley's misunderstanding of McCarthy's promise. However, if Heatley and Schapiro misunderstood this promise, it was through no fault of McCarthy or the government; as noted, the government had the reasonable interpretation of McCarthy's language and lived up to its end of the bargain. Absent government misconduct of some kind, there is no basis for finding the confession involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 163–64, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986); *U.S. v. Salameh*, 152 F.3d 88, 117 (2d Cir.1998).

### IV. *Quantum Meruit*

Having failed to show breach of promise, Heatley also asks this Court to

---

**12.** Heatley's brief refers to a rescission of the proffer agreements, but given that Heatley has already "performed"—i.e., given the government information in the proffer sessions— rescission would provide no remedy; what he actually seeks is restitution of the benefit conferred upon the government.

find that he should be compensated—in the form of a cooperation agreement—under the principle of quantum meruit. The Court is highly dubious that a theory of quantum meruit is applicable to this context. Although principles of contract law may be useful in analyzing the mutual obligations of a defendant and the government in the cooperation context, the analogy is an imperfect one, *see United States v. Rosa,* 123 F.3d 94, 98 (2d Cir.1997); this does not mean that the entire body of contractual, quasi-contractual and restitutionary law should be imported. *See, e.g., 1–95–CV–553–P1 v. 1–95–CV–553–D1,* 75 F.3d 135, 136 (2d Cir.1996) (contract principles do not govern the remedies for breach of a plea agreement). Given the important interests represented by the United States Attorney, a court should think twice before allowing the government's ability to prosecute to be limited absent express promises to that effect. Moreover, quantum meruit requires an assessment of the reasonable value of the services provided, which would entail the Court's assessment of the value of Heatley's cooperation, the impropriety of which has already been discussed.

 Even assuming the theory applicable, however, Heatley would not prevail. Quantum meruit requires a showing of, *inter alia,* "an expectation of compensation" for the services rendered. *See, e.g., Curtis Properties Corp. v. Greif Cos.,* 236 A.D.2d 237, 239, 653 N.Y.S.2d 569, 571 (1st Dep't 1997). Assuming Heatley's proffer statements were "services rendered," Heatley might have had a hope of getting a cooperation agreement, but he could not have had a reasonable expectation of one given McCarthy's statements to Heatley that there was no guarantee that a cooperation agreement would be forthcoming, and that the purpose of the proffer sessions was precisely to allow the government to evaluate whether it wanted to offer such an agreement. In short, the government was in no way unjustly enriched by Heatley's proffer statements.

## V. *Fraudulent Inducement*

Heatley also argues that he was fraudulently induced into the proffer sessions by misrepresentations on the part of the government. The first misrepresentation alleged involves McCarthy's third assurance—i.e., that she would let Schapiro know if it "wasn't going anywhere"—which is alleged to have been a misrepresentation because McCarthy testified that her policy is never to advise a potential cooperator as to how well or poorly he or she is doing in the proffer sessions. The misrepresentation, in other words, was of McCarthy's intent to fulfill this promise. The second misrepresentation alleged relates to McCarthy's first assurance—that Heatley's activities would not rule him out as a potential cooperator. McCarthy allegedly told Schapiro that she would verify with Glazer that this was in fact the USAO's policy, but Glazer responded that the office would have to "hear what he [Heatley] had to say" before determining whether a cooperation agreement would be forthcoming. Heatley contends that, first, this was a materially different statement than the one made by McCarthy to Schapiro, and second, that by failing to relay this to Schapiro, McCarthy by her silence implied that Glazer had confirmed McCarthy's assurance.

 A claim of fraudulent inducement requires a showing of a fraudulent or material misrepresentation by one party which induces assent to the challenged agreement by the other party. *See* Restatement (Second) of Contracts § 164(1). An intent to perform a promise is a "fact" which can constitute a misrepresentation if the promisor in fact did not intend to perform. *See Warner Theatre Assocs. Ltd. Partnership v. Metropolitan Life Ins. Co.,* 149 F.3d 134, 136 (2d Cir.1998); Restatement (Second) of Contracts § 171. The failure to disclose a fact may constitute a misrepresentation where disclosure is necessary to prevent a prior statement from

being a misrepresentation. *See* Restatement (Second) of Contracts § 161(a).

As for the first alleged misrepresentation, it fails because, as noted earlier, Heatley misconstrues the scope of McCarthy's promise to let Schapiro know if the proffers were not going anywhere. It is not inconsistent for McCarthy to make such a promise yet still intend not to advise Heatley on an ongoing basis of how well or poorly he was doing in the proffer sessions and to advise him of any concerns over credibility. When McCarthy made this promise, there is no evidence that she did not intend to perform, and, as found earlier, she did perform.

As for the second misrepresentation, it fails for two reasons. First, the evidence at the hearing does not support the contention that McCarthy made a representation to Schapiro that she would confirm the first assurance with Glazer. Rather, McCarthy told Shapiro that she had consulted with her superiors "with regard to whether the government ought to proffer Mr. Heatley." Tr., at 23. Assuming, however, that this implied acceptance of the first promise (because if Heatley were, in fact, already disqualified, McCarthy's superiors would presumably not have consented to the proffer sessions), Glazer's "wait and see" comment was in no way inconsistent with McCarthy's first promise, as interpreted by this Court. Thus, McCarthy was under no obligation to "correct" the impression, if any, that Glazer agreed with McCarthy's assurance, and there was, therefore, no misrepresentation in not reporting Glazer's exact words.

## VI. *Equitable Immunity*

Heatley also argues that, under the principles of equitable immunity, the government must be prohibited from using his proffer statements and further, that a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), will demonstrate that the superseding indictments in this case were obtained by use of these proffer statements and must therefore be dismissed. Neither the Supreme Court nor the Second Circuit has ever approved of the doctrine of equitable immunity, which rests on the underlying principle that "when a promise of immunity induces a defendant to . . . cooperate with the government to his detriment, due process requires that the prosecutor's promise be fulfilled," *United States v. Fuzer*, 18 F.3d 517, 521 (7th Cir.1994), despite the fact that formal use immunity does not arise under 18 U.S.C. § 6002 or other statutory provisions.

The Court need not decide whether the principle should be adopted here, because the Government made no promise of immunity to Heatley. To the contrary, the proffer agreements signed by Heatley specifically allow the government to use Heatley's statements in certain ways, and McCarthy explained to Heatley this fact prior to the first proffer session. There being no promise and no agreement that Heatley would receive immunity in exchange for cooperation, there can be no equitable immunity. *See United States v. McHan*, 101 F.3d 1027, 1034 (4th Cir.1996) (first element of equitable immunity is an agreement to exchange immunity for cooperation), *cert. denied*, 520 U.S. 1281, 117 S.Ct. 2468, 138 L.Ed.2d 223 (1997).

## VII. *Supervisory Authority*

Heatley next urges that, even if the government's actions breached no law or constitutional duty, they are nonetheless still sufficiently disturbing that this Court should use its inherent supervisory authority to require two procedural rules be followed during proffer sessions. First, Heatley asks that "if a prosecutor believes that a particular account of an incident is unacceptable and would or could be fatal to that defendant's chances of obtaining an agreement if the account did not change, she should be required to disclose that belief in general terms, at the earliest opportunity." Def.Supp.Mem., at 90–91. Second, Heatley suggests that "the gov-

ernment should be required to explain in advance the general type of information that it anticipates a defendant will disclose for purposes of assessing that defendant's chances of obtaining a cooperation agreement." *Id.* at 91. Both rules, Heatley urges, will "dramatically improve a defendant's ability to protect himself against the risks of abuse, gamesmanship and simple neglect in the proffering process," but neither will affect the government's ability to determine who will or will not be granted a cooperation agreement. *See id.* at 90. The Court declines Heatley's invitation, for two reasons.

■ First, this Court's supervisory authority is not as broad as Heatley would have it. It is true that federal courts have the power, pursuant to their obligation to "supervise 'the administration of criminal justice' among the parties before the bar," *United States v. Payner,* 447 U.S. 727, 735 n. 7, 100 S.Ct. 2439, 2446 n. 7, 65 L.Ed.2d 468 (1980) (quoting *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L.Ed. 819 (1943)), to "formulate procedural rules not specifically required by the Constitution or the Congress." *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983). However, this power is not a form of "free-floating justice, untethered to legal principle." *United States v. Ming He,* 94 F.3d 782, 792 (2d Cir.1996). "The purposes underlying the use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, and finally, as a remedy designed to deter illegal conduct." *Hasting,* 461 U.S. at 505, 103 S.Ct. at 1978 (citations omitted).

■ The supervisory authority does not generally extend beyond policing the integrity of the judicial proceedings themselves. The supervisory authority is certainly not, in any case, a warrant for courts "to fashion their own 'sub-constitutional' limitations on the conduct of law enforcement agents." *United States v. Myers,* 692 F.2d 823, 847 (2d Cir.1982); *see also United States v. Lau,* 714 F.2d 209, 210 (2d Cir.1983) ("the federal judiciary's supervisory powers over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all"); *cf. Ming He,* 94 F.3d at 792 ("This particular exercise of supervisory power is not an encroachment on the conduct of executive branch officials, that is, we are not attempting to govern the conduct of federal agents whose task is to investigate and prevent criminal activity."); *In re N.D.N.Y. Grand Jury Subpoena,* 811 F.2d 114, 118 (2d Cir.1987) ("[W]e do not attempt to control the executive branch's behavior"). Thus, for example, it is not within the supervisory authority of the federal courts to fashion a rule requiring prosecutorial disclosure of exculpatory evidence to a grand jury, *see Williams,* 504 U.S. at 54, 112 S.Ct. at 1745; or to scrutinize the conduct of an FBI "sting" operation for other than constitutional violations. *See United States v. Myers,* 692 F.2d 823, 847 (2d Cir.1982).

*Ming He,* relied upon by Heatley, is not to the contrary. In *Ming He,* the Second Circuit held that it was error for a district court, in determining the extent of downward sentencing departure, to rely upon disparaging comments made in the prosecution's § 5K1 letter where those comments rested upon debriefing sessions in which the cooperator/defendant's attorney was not present. *See Ming He,* 94 F.3d at 792–93. The court declined to decide whether there was a Sixth Amendment right to counsel in cooperation debriefings, fashioning the rule instead under the Second Circuit's supervisory authority over the district courts. *Id.* at 792. The *Ming He* court specifically disavowed any power to "govern the conduct of federal agents." *Id.* Rather, the power of the court to fashion a supervisory rule was predicated on the fact that the cooperation process was integral to the sentencing process, an area of traditional supervisory authority. *See*

*id.* ("Our supervisory authority extends to sentencing, particularly when we are dealing with a procedure for which a uniform practice is called for.").

▮ The type of rule urged by Heatley is precisely the sort of control over executive branch officials that is beyond the power of this Court. Even accepting that the type of procedural rule forged in *Ming He* is within the supervisory authority of the federal courts over prosecutorial activity, the proposed rules are not merely procedural but more of a substantive control over the content of the USAO's cooperation negotiations. The rules proposed would thus be far more intrusive than the right to counsel fashioned in *Ming He.* Moreover, Heatley has not suggested that the fruits of these negotiations—i.e., the statements made—have led to any taint in anything other than the superseding grand jury indictments, an area not within the Court's traditional supervisory authority, and certainly not after *Williams.*

Second, even if this Court had the power to impose the rules it suggests, the Court is not convinced that these rules are either wise or necessary. First, as noted by McCarthy, a rule requiring the prosecution to immediately flag every serious problem it had with the profferer's honesty would enable the potential cooperator to tailor his testimony to what the prosecution apparently wanted, thus seriously undermining the value of the process to the USAO and interfering, contrary to Heatley's assertion, with the ability of the USAO to properly determine who will and will not be offered cooperation agreements. Sec-

ond, there is no need for a rule requiring prosecutors to specify in advance what information is required in order for a defendant to get a cooperation agreement; if this information is a necessary prerequisite to the defendant's cooperation, there is no reason the defendant, through counsel, could not attempt to get such an advance reading from the USAO and condition his proffering on that information.

Finally, the Court notes that its refusal to fashion the controls urged by Heatley in this case does not leave defendants without recourse. There are powerful institutional incentives which serve to keep the U.S. Attorney's office practices within certain bounds. The USAO is, to say the least, a repeat player in the federal criminal justice system, and the USAO has a strong interest in gaining potential cooperators in the future. Should their practices come to reflect, in the opinion of the defense bar, bad faith or present defendants with unacceptable risks of being, in Schapiro's words, "milked," the USAO's ability to obtain cooperation agreements will be damaged. *See Rexach,* 896 F.2d at 714.[13]

## VIII. *Ineffective Assistance of Counsel*

Finally, Heatley asserts that he was denied the effective assistance of counsel by Schapiro's representation in four respects: (1) Schapiro failed to investigate the admissibility of Heatley's post-arrest statements and therefore incorrectly calculated that cooperation was the best course; (2) Schapiro failed to adequately investigate with Heatley the extent of his possible exposure to future criminal liability; (3)

---

**13.** In construing McCarthy's statements in the manner it has, in refusing to find a breach of the duty of good faith, and in refusing to exercise its supervisory power, the Court does not mean to imply that the government's conduct in this case is not troubling on some important levels. The government does not dispute that Heatley presented extensive details, some unknown to the government, against all of his codefendants. Neither can the government dispute that Heatley's cooperation would have substantially assisted in the prosecution of some serious criminal activity,

like the murder of 11–year–old Donnell Porter. This conduct makes a strong basis for the claims of the defendant that the government's actions in this case will seriously jeopardize the confidence with which defense counsel can trust the Southern District U.S. Attorney's office in proffering defendants involved in serious criminal activity. However, these are policy issues left to the discretion of the government and it will have to deal with the repercussions of an incident that may well be viewed by many as proof of the fears expressed by Gottlieb to Heatley.

Schapiro failed to intervene and stop Heatley from assisting the government in obtaining the cooperation of a codefendant; and (4) Schapiro failed to advise Heatley that any statements made could be presented to a grand jury in order to obtain further indictments. Heatley's arguments fail on all counts.

Assuming that the decision of a defendant to enter into post-indictment cooperation negotiations, as well as those negotiations themselves, are "critical stages" at which a defendant is entitled to the effective assistance of counsel, *cf. Ming He,* 94 F.3d at 786–93 (exercising supervisory authority to create right to counsel at post-guilty plea cooperation debriefings; not deciding whether required by Sixth Amendment); it is Heatley's burden, in order to successfully establish his ineffective assistance claim, to make a two-fold showing: (1) counsel's performance was unreasonably deficient under prevailing professional standards, and, (2) but for counsel's unprofessional errors, there exists a reasonable probability that the result of the proceeding would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2067, 80 L.Ed.2d 674 (1984); *United States v. Torres,* 129 F.3d 710, 716 (2d Cir.1997).

In assessing the first prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Further, this determination must be made in light of all the circumstances. *See id.* at 690, 104 S.Ct. at 2066. The reasonable interpretation of the prejudice prong in this context is that, but for counsel's alleged errors, Heatley would not have entered into the proffer sessions. *Cf. Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (in plea bargain context, prejudice requires a showing that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.").

### A. *Failure to Investigate the Post–Arrest Statement's Admissibility*

 Heatley's first claim is that Schapiro should have investigated the circumstances surrounding Heatley's post-arrest statement, and, had he done so, Schapiro would have realized that the statement was inadmissible. Had he realized this, the argument continues, the perceived likelihood of success in going to trial would have been greater, the incentives to proffer correspondingly lower, and Heatley would not have proffered. However, as Schapiro realized, "it's a huge uphill battle to get a statement suppressed," Tr., at 327, and that of course turned out to be true in this case—as noted, this Court denied Heatley's motion to suppress his post-arrest statements. Moreover, Schapiro knew that the government had more, probably much more, evidence against Heatley than simply his post-arrest statement. *See id.* ("[T]here was an investigation and evidence that went well beyond, it was my sense even at this early stage, well beyond the statement Mr. Heatley gave.").

It would have been well within the range of competent defense strategies, therefore, to decide that even if there was evidence to support a suppression motion, the likelihood of success on the motion was poor, and, given the other evidence that would remain even in the event the statement was suppressed, an attempt at cooperation was still the best option. Schapiro testified to this effect, *see* Tr., at 326–27, and while this testimony is necessarily speculative and therefore not dispositive of the issue, the Court agrees that it is unlikely that further investigation of the post-arrest statement would have produced a different result. Therefore, Heatley's ineffective assistance claim fails on this point because either (1) Schapiro's decision not to investigate was reasonable in light of the circumstances, *see Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes

particular investigations unnecessary"); or (2) had Schapiro investigated, he would have reached the same decision on cooperation and thus there is not a reasonable probability that the outcome would have been different.

### B. *Failure to Adequately Investigate the Extent of Heatley's Culpability*

■ The second claim made is that Schapiro did not make an adequate investigation into the extent of Heatley's culpability—i.e., Schapiro did not sufficiently appreciate the scope of self-incriminating statements which Heatley would be making in the proffer sessions. Therefore, Heatley says, Schapiro did not advise Heatley of the risks involved in proffering. This claim fails for much of the same reasoning as the post-arrest claim.

To begin with, the evidence presented does not convince this Court that an inadequate investigation was made. Schapiro discussed with Heatley the fact that Heatley was involved in 10 or 11 homicides, and while Schapiro might not have known the precise details, he investigated enough to appreciate the risks of going into a proffer session with the government, especially given McCarthy's initial warning to him that the indictment was merely the "tip of the iceberg." Here, too, Schapiro testified that he would not have changed his position even had he had a fuller understanding of Heatley's personal involvement, *see* Tr. at 327, and again this Court agrees that it is unlikely, given the circumstances, that any change in strategy would have been forthcoming. It appears from the

record that Schapiro did, in fact, properly advise Heatley of the risks involved.[14] Moreover, even in hindsight and with knowledge of all that Heatley said, it was still not an unreasonable strategy to attempt cooperation; at that stage it could reasonably have appeared to be the best option. Thus, Schapiro's investigation was reasonable under the circumstances, and in any case the further investigation now suggested by Heatley would most likely not have resulted in a different outcome; under either prong of *Strickland,* this claim fails.

### C. *Failure to Stop Heatley's Assistance in Encouraging Other Cooperators*

■ Heatley's next claim is that Schapiro failed to intervene to stop Heatley from responding to Agent Walsh's request for information which could be used to help "flip" a potential cooperator. According to Heatley, this assistance was so clearly against Heatley's interest that competent counsel should have stepped into stop this.

While the Court might agree that, in hindsight, the decision to help "flip" this particular cooperator was not the best strategic move, it is not from the vantage point of hindsight that this Court must evaluate Schapiro's effectiveness. From Schapiro's standpoint at the time, it reasonably appeared that the cooperation effort was going well, and it was well within the range of acceptable strategy to attempt to satisfy this request from the government, as a show of Heatley's good faith

---

**14.** For this reason, Heatley's reliance on *Boria v. Keane,* 99 F.3d 492 (2d Cir.1996), *cert. denied,* 521 U.S. 1118, 117 S.Ct. 2508, 138 L.Ed.2d 1012 (1997), is misplaced. In *Boria,* the attorney failed to give his client any advice on whether to accept a plea bargain, a failure which the court held to be unreasonable under the first *Strickland* prong. *See id.* at 497–98. Schapiro did fulfill his constitutional duty to give his advice to Heatley on whether to proffer. Further, contrary to Heatley's assertion, *Boria* did not hold that

"failure to advise, alone, constitutes ineffective assistance, even if the client would oppose the advice." Def. Mem., at 49. *Boria* specifically relied on the fact that, if proper advice had been given, there was "a very strong likelihood" that the plea bargain would have been accepted, thus satisfying the prejudice prong of *Strickland. See Boria,* 99 F.3d at 497. Thus, the Court's finding that the proffering would have gone forward anyway forecloses Heatley's claim regardless of whether Schapiro's advice was fully informed and adequate.

and willingness to cooperate. This claim thus fails the first *Strickland* prong. Further, as noted earlier, *see supra* note 5, the Court has found that Heatley's assistance did not produce the cooperation of the other person, and so Heatley's claim fails the prejudice prong as well.

### D. *Failure to Advise that Heatley's Statements Could be Used By the Grand Jury*

Heatley's last specific claim on ineffectiveness is that Schapiro never advised Heatley that the government could use his statements before a grand jury to obtain additional indictments against him. It is true that this advice was never given. It is less clear that this would have been accurate, in light of the government's obligation not to use Heatley's statements directly in its case-in-chief.[15] Regardless, it is also true, however, that the Sixth Amendment does not guarantee a right to perfect counsel, only one that is reasonably competent, *see, e.g., United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984), and this one oversight, standing alone, does not meet the *Strickland* first prong. Assuming, moreover, that failure to give this piece of advice fell below the *Strickland* competence standard, Heatley has presented no evidence of prejudice—i.e., no reason to believe that had he heard this piece of information, he would have refused to proffer. The only evidence offered goes to whether the government used Heatley's statements in the indictment, but that is not the relevant prejudice—in other words, if Heatley would have proffered even had he received the advice about grand jury use, then Schapiro's error (if it was one) was harmless. Considering the risks which Heatley already knew about proffering—i.e., that the government could use his statements as leads to further evidence against him, and could use his statements to impeach or rebut (and thus effectively limit his ability to testify at trial)—it seems unlikely that the risk of further indictments, at the trial of which the government would *not* be able to use his statements, would have deterred Heatley from cooperating. At least, Heatley has failed to meet his burden to demonstrate that such an occurrence is reasonably probable. Thus, this claim also fails.

### E. *Schapiro's Overall Effectiveness*

Looking at the overall effectiveness of Schapiro as Heatley's counsel, it is clear that Heatley received the reasonably effective counsel which is guaranteed him by the Sixth Amendment. In hindsight, one might question whether Schapiro's optimism about the possibilities for a cooperation agreement were somewhat inflated, given the fact that his client was suspected of being the leader of an allegedly brutal enterprise. Schapiro might have tried to get more guarantees, or tried to test the waters more with an attorney proffer of the information Heatley could provide; perhaps this would have flushed out the need to provide information outside the "Crew."

Such speculation is, however, precisely the sort of judicial second-guessing which

---

15. In *Liranzo,* the Second Circuit upheld the use of proffer statements, procured under a written proffer agreement identical to the ones in this case, *indirectly* in a superseding indictment. The government in that case used the proffer statements as a lead to elicit further information from a cooperator which was subsequently used in the indictment. *See Liranzo,* 944 F.2d at 77–78. The court was not faced, however, with direct use of the statements.

Because the proffer agreement does not address the issue of grand juries, it would appear that the question of whether the government may use the proffer statements directly before a grand jury would depend upon whether the proffers are construed as a blanket waiver of the Fifth Amendment privilege except for the limitations expressly placed on the government, or whether the proffers are viewed as a limited waiver only for the purposes which the proffer agreement allows the government. Given the general presumption against waiver of rights and the rule requiring construction of the proffer agreements against the government, the Court would be inclined to find only a limited waiver, but need not decide the issue.

*Strickland* forbids. The reality is, Schapiro and Heatley had few options at that stage. Schapiro knew he had a defendant, charged with serious crimes and against whom the government believed it had much more, who had made inculpatory statements, and who, if he were going to have any chance at cooperating, probably had to do so sooner rather than later because Heatley's codefendants—mostly with lesser culpability in the government's eyes and therefore more likely candidates for cooperation—were being interviewed. Moreover, Schapiro did not simply throw Heatley to the government wolves; he negotiated, and received, certain assurances from the government in an effort to protect Heatley's interests. He gave Heatley his advice as to the risks and benefits of proffering. He attempted, when the cooperation agreement was rejected, to find out how to revive it. In the totality of the circumstances, Schapiro performed adequately—not perfectly, but he provided the level of effective counsel which the Sixth Amendment guarantees. The Court therefore denies Heatley's claim of ineffective assistance.[16]

### CONCLUSION

For the foregoing reasons, the Court denies Heatley's motion to dismiss the superseding indictment or to order the United States to offer Heatley a cooperation agreement.

**SO ORDERED.**

---

**16.** Because the Court finds that there is no basis for finding that the government breached any duties owed to Heatley and that Heatley has no claim for ineffective assistance of counsel, the Court need not and does not reach the issue of whether in fact the superseding indictments in this case were obtained by the use of Heatley's proffer statements or whether, as the government contends, the indictments were obtained from completely independent sources.